**DYNAMICS CORPORATION OF AMER-ICA (Formerly Claude Neon, Inc.)**

v.

**The UNITED STATES.**

**No. 178–68.**

United States Court of Claims.

Oct. 15, 1971.

Fred R. Tansill, Washington, D. C., attorney of record, for plaintiff. McInnis, Munson & Tansill, Washington, D. C., of counsel.

Michael H. Singer, Washington, D. C., with whom was Acting Asst. Atty. Gen. Fred B. Ugast, for defendant. Philip R. Miller, Washington, D. C., and Joseph Kovner, of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

### PER CURIAM:

This case was referred to Trial Commissioner Lloyd Fletcher with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on July 26, 1971. On September 8, 1971, the parties filed a joint motion requesting that the court confirm or adopt the opinion and report of the trial commissioner with one exception with respect to Finding 25 as set forth in the joint motion. Since the court agrees with the commissioner's opinion, findings (with the modification requested of Finding 25 by the parties) and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same, as modified, as the basis for its judgment in this case without oral argument. Therefore, plaintiff is entitled to recover under Count I of its petition with the amount of such recovery to be determined pursuant to Rule 131(c). Plaintiff is not entitled to recover under Counts II and III of its petition, as amended, and as to those counts the petition is dismissed.

## OPINION OF COMMISSIONER

FLETCHER, Commissioner: This is a suit brought by the plaintiff for refund of Federal corporation income taxes paid by it to defendant for the taxable year ended December 31, 1958. The petition, as amended, sets forth three separate counts. Count I raises the issue of whether plaintiff properly reported a long-term capital gain of $332,184 arising from the sale by plaintiff in 1958 of improved land known as 215 E. 91st Street, New York City. The defendant contends that the gain from this real estate sale should be attributed to Reeves Instrument Corporation, a wholly owned subsidiary of the plaintiff, and thus, Count I raises the question of who is the proper taxpayer in this transaction under the facts stated below.

Count II refers to a transaction which occurred in 1954 but which can affect the taxable year here involved by reason of net operating loss carryovers. In 1954, plaintiff claimed a deduction of $400,000 for "Other Deductions—Settlement of Law Suit" which produces a net operating loss of $537,659.12 in 1954, if allowed. This was an amount incurred and paid in the settlement of a minority stockholder's derivative suit in 1954. The defendant denies the plaintiff's right to the deduction of the entire $400,000 and thus, the second question presented is whether the plaintiff may deduct $400,000 in 1954, being the amount paid by it in 1954 at the time of and as a part of the settlement of a derivative stockholder's suit filed in the New York State courts.

Count III of the amended petition raises the familiar question of whether there is an impermissible variance between plaintiff's claim for refund and the claims asserted in this court. It is undisputed that in the event the issue raised by Count II is decided in defendant's favor, the court need not reach the question posed by Count III.

Based upon a full review of the stipulated record in this case, and for the reasons set forth in the following de-

tailed ultimate findings of fact and conclusions of law, it is concluded that plaintiff is entitled to recover under Count I of its petition, as amended, the determination of the amount of recovery, if any, to be reserved for further proceedings under Rule 131(c). It is further concluded that plaintiff is not entitled to recover under Counts II and III of its petition, as amended, and as to those counts, plaintiff's petition should be dismissed.

## FINDINGS OF FACT
## INTRODUCTION

The facts in this case have been fully stipulated. However, due to disagreement between the parties with respect to the relevancy of some of the stipulated facts, as well as differences regarding ultimate findings, it has been necessary for counsel to submit their respective briefs and requests for findings of fact. The following is a summary of the stipulations, and their accompanying exhibits, to the extent deemed relevant to the issues involved.

## BACKGROUND FACTS

1. Claude Neon, Inc. (hereinafter sometimes referred to as Neon) was a New York corporation formed in 1924. Effective April 15, 1955, it merged into Dynamics Corporation of America (hereinafter sometimes referred to as Dynamics), the plaintiff herein. Effective January 20, 1956, Reeves-Ely Laboratories, Inc. (hereinafter sometimes referred to as Reeves-Ely), also merged into Dynamics. Prior to the latter merger, Reeves-Ely had been a controlled subsidiary of Neon and, later, of Dynamics. Both Neon and Reeves-Ely were holding companies; Reeves-Ely had six, wholly owned, manufacturing subsidiaries engaged primarily in making electronic equipment, television and radio broadcasting equipment, home appliances, and air-conditioning equipment.

2. Although Neon (and subsequently Dynamics) owned a majority and controlling interest in Reeves-Ely, the percentage of that ownership was not quite large enough for affiliation under Section 141 of the 1939 Code or Section 1504 of the 1954 Code in 1953–1954. Some Reeves-Ely preferred stock was convertible into its common stock and a block of such preferred stock was publicly owned; if preferred was converted into common, Neon's ownership interest in Reeves-Ely would have been reduced below 95 percent of the total outstanding shares.

3. During the taxable years here involved, the office and principal place of business of Neon (later Dynamics) was at 25 West 43rd Street, New York, New York. Presently, the office of Dynamics is located at 501 Fifth Avenue, New York, New York.

4. Dynamics and all of its subsidiaries kept their books and records and filed their tax returns on a calendar-year basis and all were on the accrual method of accounting for all of the years here involved.

5. For 1958, a consolidated Federal income tax return was filed by Dynamics and its affiliates, which return was timely filed with the Office of the District Director of Internal Revenue for the Upper Manhattan District on or about September 15, 1959. The tax liability shown on that return, $716,389, was paid with the return and later a deficiency for 1958 of $180,606 was paid on or about February 6, 1967, after acceptance of Internal Revenue Service's audit adjustments.

6. On June 27, 1967, Dynamics filed a timely claim for refund on Form 843 for the year 1958 claiming a refund of $362,393.74. The Commissioner of Internal Revenue, by letter dated December 5, 1967, advised Dynamics of the disallowance of that claim.

7. After rejection of its claim, Dynamics filed a petition in this court on June 12, 1968, for refund of $362,393.-74 for 1958. As a result of filing a first amended petition raising Count III, the

amount in controversy has now become $229,538.34.[1]

## 215 E. 91ST STREET

8. On March 10, 1947, 215 East 91st Street Corporation (hereinafter 215 Corp.), a wholly owned subsidiary of Reeves-Ely, purchased a building at 215 East 91st Street, New York, from Greater New York Industries, Inc. The purchase price was $80,000, of which $5,-000 cash was paid to the seller together with the assumption by the purchaser of a $75,000 pre-existing mortgage on the property. Shortly after the purchase, 215 Corp. renegotiated the mortgage which was increased to an amount of $175,000; by March 31, 1951, payments on the principal of this mortgage had reduced it to $161,875. On that day, Reeves-Ely liquidated its wholly owned real estate subsidiary, 215 Corp., and received the building in a liquidating distribution at cost less depreciation, and assumed the balance of the mortgage obligation. On the same date, Reeves-Ely transferred the building to Reeves Instrument Corporation (hereinafter Reeves), another wholly owned subsidiary of Reeves-Ely, as a contribution to capital of $310,000. The appraised value for the building on March 31, 1951, was $310,000.

Reeves then assumed the mortgage obligation of $161,875 and attributed the $148,125 balance of the $310,000 to capital stock for which it issued additional shares to its parent company, Reeves-Ely. The amount of $310,000 was thereafter carried on the books of Reeves as the value of the building. As previously noted, Reeves-Ely merged into Dynamics, effective January 20, 1956, after which Reeves was a direct subsidiary of Dynamics.

9. Reeves was a manufacturer of sophisticated electronic equipment both specialized and general, including items such as devices for missile guidance and control, inertial navigation, precision instrumentation radar, long range radar systems, radar bomb scoring, precision floated gyros and accelerometers, electro magnetic resolvers and devices, electronic ground support equipment, electronic analogs and digital computer systems, outer space systems, devices and components, and servo control systems.

10. Beginning about the middle of 1956, Reeves began moving all of its manufacturing operations out of 215 E. 91st Street and into a new, modern plant at Roosevelt Field, Garden City, Long Island.

11. In November 1957, Reeves advertised the building located at 215 E. 91st Street as being for sale. This action was taken by the assistant to the president of Reeves who was in charge of all real estate disposals by the Dynamics group and was taken at the instruction of the president of Dynamics. Such advertisement was carried once in the November 17, 1957 Sunday edition of the New York Times, but, no sale resulting, no further efforts were made by Reeves to advertise the building for sale.

12. Under a "V-Loan Agreement" in effect in 1958, Reeves was only permitted to distribute 60 percent of its net profits, after taxes, accrued from the period beginning December 31, 1954, as a dividend to its parent corporation. The V-Loan Agreement also provided that all dividend distributions were to be made in cash. Because of these restrictions, Reeves requested (and later received) special permission on January 16, 1958, to distribute its building at 215 E. 91st

1. It appears that the amount of $362,393.74 was overstated; $368,856.20 of the 1954 net operating loss of $537,659.12 (assuming a holding for plaintiff on the $400,000 deduction issue) is absorbed in 1953 upon carryback and the maximum balance available to carryover to 1958 is now stipulated at $168,802.92 under the 1954 Code. Adding to this amount the long-term capital gains item of $331,243 ($\times 25\%$ is $82,811) gives a present value to the claim (excluding Count III) of $170,588.52. Including Count III ($113,365.03$\times$52%, or $58,949.82) gives a total tax in controversy here of $229,538.34, despite the prayer in the amended petition.

Street to Dynamics as a dividend in lieu of cash. Under its V-Loan Agreement, as of January 16, 1958, Reeves had $1,-135,620 available for cash distributions to Dynamics. From January 1, 1955, through January 16, 1958, Reeves had distributed $600,000 in cash as dividends to its parent corporation, Neon, and its successor, Dynamics.

13. By January 16, 1958, all of Reeves' operations had been transferred to Roosevelt Field, with the exception of a part of its accounting activities and the executive offices which were still maintained at 215 E. 91st Street. These remaining activities were at that time scheduled to be moved to Roosevelt Field by March 1, 1958, at which time Reeves would have no further occupancy in or use for the New York building. Once Reeves terminated its occupancy at this location, neither Dynamics nor any of its subsidiary corporations had any further use for the building.

14. At a special meeting of the board of directors of Reeves, held on February 10, 1958, in New York City, the chairman stated that in the very near future all of the operations of Reeves currently conducted at 215 E. 91st Street, would be transferred to the company's new plant and offices at Roosevelt Field on Long Island. He called the board's attention to the fact that the sole stockholder of Reeves had contributed the premises at 215 E. 91st Street to Reeves when said premises were needed by it to be used for its manufacturing operations and as office space. He disclosed that Dynamics had expressed a willingness to accept the return of said property at this time as a dividend. After discussion, it was duly resolved that because "215 East 91st Street, heretofore contributed to this Corporation by its sole stockholder to be used as manufacturing and office space, will soon cease to be used for the purpose for which this Corporation is organized"; and because "Dynamics * * *, the sole stockholder of this Corporation, has expressed a willingness to accept said real property as a dividend"; therefore, the proper of-

ficers of the Corporation were authorized to convey 215 E. 91st Street to Dynamics. This was done and title to the property was passed to Dynamics effective the same day.

15. On February 11, 1958, Reeves and Dynamics entered into a rental agreement whereby Reeves agreed to let the space at 215 E. 91st Street from Dynamics at a monthly rate of $3,333.33 for the period beginning February 10, 1958, until the date of the final move of Reeves from the premises. It was also agreed that tenants of Reeves would continue as its subtenants and Reeves would collect for their own account any rentals from its subtenants who were its tenants occupying parts of the building on or before February 10. The lease agreement was modified on May 12, 1958, to reduce Reeves' monthly rental payments to Dynamics to $500. The Winsted Hardware Laboratory, previously a subtenant of Reeves, was made a tenant of Dynamics as part of the same modification. Reeves remained in possession of its part of the premises until it finally vacated on May 30, 1958. From that date until November 19, 1958, Dynamics continued to receive rent only from Winsted Laboratory.

16. In March 1958, after it became apparent that 215 E. 91st Street would be completely vacated in the immediate future, Dynamics placed several ads in a New York paper regarding the sale of 215 E. 91st Street. Responses were received to the ads but no immediate sale was consummated. A number of real estate brokers also responded to the ad and sought exclusive listing of the property for sale. However, in conformity with established company policy and practice, no exclusive listing was given by Dynamics although a number of agents were permitted to list the property on a nonexclusive basis. One of the local brokers responding to the newspaper ads, later produced a prospective buyer named Abner A. Raeburn.

17. A special meeting of the board of directors of Dynamics was held in New York City on November 7, 1958, with the

entire board present. One of the matters receiving the attention of the board at this meeting was the sale of 215 E. 91st Street. It was reported that Abner A. Raeburn, residing at 888 Park Avenue, New York, New York, had offered to buy the building known as 215 E. 91st Street from Dynamics. After discussion, it was duly resolved that it was in the best interests of Dynamics and its stockholders that the Corporation enter into an agreement with Raeburn for the sale of 215 E. 91st Street. Therefore, the proper officers of Dynamics were authorized to do all things necessary or convenient to effectuate the sale. Because it was desirable also to sell the purchase money mortgage to be received at the sale of 215 E. 91st Street, it was also resolved that the proper officers of Dynamics were authorized to do all things necessary or convenient to effectuate the sale of the purchase money mortgage (called for by the sale agreement with Abner A. Raeburn) to a lending institution of their choice on such terms and conditions as they may deem best.

18. By an agreement of purchase and sale dated November 7, 1958, Dynamics conveyed title and ownership of premises 215 E. 91st Street to Abner A. Raeburn for a total purchase price of $365,000, $200,000 of which was paid in cash with the balance covered by a purchase money mortgage. Title was closed on November 19, 1958 at the offices of Dynamics' attorneys. The taxable gain to Dynamics resulting from this transaction amounted to $332,134.

19. The foregoing negotiations and ultimate sale of premises 215 East 91st Street by Dynamics were conducted by John D. Halloran, presently vice-president of Dynamics in charge of real estate, public relations, and stockholder relations.

From November 15, 1955, through January 31, 1963, Halloran was employed by Reeves as assistant to the president. During that entire period, Halloran was in charge of and responsible for all real estate acquisitions and disposals, rentals, site selections, public relations, and stockholder relations for the parent company, Dynamics, and all of its subsidiaries, affiliates, and divisions.

In 1957, Halloran had been told by David T. Bonner, the chairman of the board and president of Dynamics, and president of Reeves, to dispose of the land and improvements located at 215 East 91st Street. At that time, the premises were still partially occupied by Reeves, but it had become apparent that the building would be completely vacated sometime in 1958.[2]

20. Dynamics reported its gain from the sale of 215 E. 91st Street on the consolidated 1958 income tax return, filed by the affiliated group of which it was the common parent. This gain was offset on the return by a net capital loss carried over from 1957 in the amount of $537,321.[3] Upon examination of the 1958 consolidated return by the Internal Revenue Service, the capital gain reported by Dynamics ($332,134) was reallocated to its subsidiary, Reeves, on the ground that Reeves, not Dynamics, was the vendor of the premises located at 215 E. 91st Street. Accordingly, Dynamics' capital gains were reduced by

2. The record contains an affidavit by Dynamics' chief accountant, Edwin G. Roy, in which he states that sometime in 1957 or 1958, he was instructed by the treasurer of Dynamics to prepare a computation demonstrating the tax effect of a sale *by Dynamics* of the 91st Street property. A work sheet containing some brief computations is attached to the affidavit. Those computations are rather incomprehensible except to demonstrate that Roy misunderstood his instructions. The computations relate to a possible sale of the property *by Reeves*, not Dynamics.

3. It has been stipulated that on February 10, 1958, Reeves did not have any capital loss carryovers, Dynamics had a capital loss carryover amounting to $537,321 for 1958, arising from the write-off by Dynamics of a worthless investment in Greater New York Breweries. This loss was allowed by the Internal Revenue Service for the taxable year 1957 and was a valid carryover to 1958.

$332,134, Reeves' capital gains were increased by the same amount, and consolidated net income for Dynamics and its affiliated group was increased by $332,134. This resulted in an asserted increase in tax to the affiliated group of $82,811 for the year 1958.

## DEDUCTION OF $400,000 PAID IN 1954 IN SETTLEMENT OF STOCKHOLDERS' SUIT

21. In 1951 Rosa B. Hirsh, a holder of some Reeves-Ely preferred stock, instituted a stockholders' derivative suit in the Supreme Court of the State of New York against Reeves-Ely, Neon, and their key officers and directors. This action was brought "in the right and for the benefit of" Reeves-Ely and asked, *inter alia*, for recovery by Reeves-Ely from Neon of all payments made in 1950 to Neon by Reeves-Ely under a December 29, 1950 Agreement. This suit also attacked the validity of the December 29, 1950 Agreement (hereinafter sometimes referred to as the 1950 Agreement) and asked for its rescission and an injunction against any further payments thereunder. It also raised six other unrelated causes of action against the various defendants. The defendants all retained counsel, and all filed answers denying the allegations of wrongdoing and opposing the relief sought by the plaintiff.

22. Other preferred stockholders similarly filed suit, and in April 1952, these actions all were consolidated into one complaint setting forth numerous causes of action sub nom. Rosa B. Hirsh, et al. v. Leo M. McAuliffe, et al., Index No. 15880–1951 (hereafter the "*Hirsh* suit"). The first cause of action in the consolidated suit, like the original complaint in the *Hirsh* suit, attacked the validity of the 1950 Agreement and asked for rescission and an injunction against additional payments thereunder. In 1953, extensive discovery proceedings were undertaken in the *Hirsh* suit.

23. In October 1953, the trial in the *Hirsh* suit began with opening statements on both sides, and was then adjourned. Thereafter, compromise negotiations ensued with respect to the first cause of action relating to the December 29, 1950 Agreement. On March 22, 1954, the adjourned trial date, the defendants moved for judgment and to dismiss all causes of action other than the first (which motion was subsequently granted). On March 25, 1953, the parties presented to the court their joint proposal to compromise the first cause of action on the basis of a payment to be made by Neon to Reeves-Ely of $400,000. Before seeking the requisite judicial and stockholder approval of the compromise proposed on March 25, 1954, the *Hirsh* suit complaint was amended to cover specifically the payments in lieu of 1951 and 1952 taxes as well as those for 1950.

24. The 1950 Agreement, referred to above, provided that Neon and Reeves-Ely would file consolidated Federal tax returns whenever a consolidated filing was required, or whenever such a filing reduced the tax liability for the entire group below what would be the aggregate tax liability if each corporation in the group filed separately. The Agreement specified that Reeves-Ely would pay to Neon, as the former's "constructive tax liability," an amount equal to Reeves-Ely's minimum tax liability. Further, it was agreed that if Neon's actual consolidated tax liability for a taxable period was reduced by the inclusion of Reeves-Ely and the latter's subsidiaries in a consolidated return, Neon would pay to Reeves-Ely as a capital contribution an amount equal to the reduction in tax liability resulting from the consolidated filing. In the event that there were adjustments to income after audit which would change the amount of Reeves-Ely's "constructive tax liability", or the consolidated Neon tax liability, or both, the Agreement provided that proper adjustment between the parties was to be made upon final determination of such changes.

25. For 1950, 1951, and 1952 Neon, as common parent, filed consolidated Federal income and excess profits tax

returns for the affiliated group. The consolidated Federal income tax liability for these years was such that substantial amounts were owed to Neon and were paid by Reeves-Ely to Neon under the 1950 Agreement. For each of these years, these payments, although in the amounts required under the Agreement, were in excess of the actual tax liability of the Neon group, and in excess of Reeves-Ely's allocable share of the actual tax liability of the Neon group. Specifically, Neon received $880,400.70 in 1953 in excess of Reeves-Ely's actual tax liability. The full amount paid to Neon by Reeves-Ely in 1953 was paid under the assumption by both companies that the 1950 Agreement was valid and binding; there were no restrictions in the aforesaid Agreement on Neon's use of any part of the payments. No part of such fund was made available to Neon prior to 1953.

26. On June 22, 1954, a judgment, pursuant to stipulation, was entered in the *Hirsh* suit. It approved a formal settlement agreed to by all parties on April 29, 1954, following a hearing at which dissident stockholders of Reeves-Ely were heard. Under the settlement, Neon agreed "with prejudice, and without admission of any liability" to pay Reeves-Ely the sum of $400,000 in "compromise and settlement of the first cause of action" which was to be dismissed with prejudice with all the other causes also being so dismissed. This joint action was taken by Neon and Reeves-Ely in reliance upon the opinions of their respective legal counsel that such a compromise settlement was "fair and reasonable" which the Court also found to be a fact. Counsel for Neon were motivated in large measure by the conviction that if there was no settlement there would probably be "lengthy and expensive" litigation despite their confidence that the 1950 Agreement "was valid and no liability of Claude Neon to Reeves-Ely resulted from the payments made thereunder." On October 6, 1954, the judgment in these matters became final and Neon then paid $400,000 to Reeves-Ely

in complete satisfaction thereof. Reeves-Ely distributed to the attorneys involved in the various derivative suits, $83,000 in attorneys' fees ($3,500 having already been paid). On the same date, Reeves-Ely retained a portion of the $400,000 and distributed the remainder, less applicable legal expenses, to its subsidiaries in proportion to the payments made by these subsidiaries with respect to the 1950, 1951, and 1952 consolidated income taxes.

27. Reeves-Ely and its subsidiaries each filed separate returns for 1954. In those returns neither Reeves-Ely nor its subsidiaries reported any portion of the $400,000 settlement payments referred to above as income. Each company took as a deduction from its respective income its allocable share. of the related legal expenses accrued. The 1954 return of Reeves-Ely and its subsidiaries were examined by the Internal Revenue Service and were accepted.

28. In the separate return for 1954 filed by Neon, a loss of $363,152.63 was reported. In computing its 1954 taxable income, Neon claimed a deduction for the $400,000 paid in satisfaction of the judgment in the *Hirsh* suit as "Other Deductions—Settlement Law Suit."

29. A Revenue Agent's Report, dated July 30, 1965, issued after audit of the 1954 Neon (now Dynamics) return, determined that it had a 1954 net operating loss of $137,659.12, after disallowance of the $400,000 deduction claimed with respect to the payment in settlement of the stockholders' derivative suit referred to above. Plaintiff disputes in this suit the propriety of the disallowance of the $400,000 deduction, but otherwise accepts the correctness of these figures. The Revenue Agent's Report, dated July 30, 1965, also reflects the allowance of a carry-back of the Neon (now Dynamics) 1954 and 1955 net operating losses, as adjusted, to 1953 but, despite such carry-back, the report also showed a deficiency of $78,628.90 for 1953, which deficiency could not be assessed because assessment was barred by the running of the statute of limitations. One of

the principal adjustments giving rise to the 1953 deficiency was the determination that Neon (now Dynamics) received dividends in the amount of $880,400.70 in 1953 from Reeves-Ely.[4] This and other adjustments had converted the originally reported net operating loss for 1953 of $302,621.85 to a taxable net income of $720,380.70.

30. On March 15, 1968, this court held in Dynamics Corporation of America (Formerly Claude Neon, Inc.) v. United States, Ct.Cl. No. 338–65, that Neon received in 1953 a total of $880,400.70 from its subsidiary, Reeves-Ely, in excess of the latter's tax liability, which amount was properly treated by the Internal Revenue Service as a dividend. 183 Ct.Cl. 101, 392 F.2d 241 (1968).

31. If Neon's 1954 settlement payment in the *Hirsh* suit of $400,000 is fully deductible as an expense in 1954, there is produced a net operating loss in 1954 of $537,659.12. An issue presented is whether there is any net operating loss carryover from 1954 available to reach 1958, after first carrying the 1954 net operating loss back to 1952 and 1953. The maximum amount available to Dynamics as a carryover to 1958 has been determined, for the purpose of this case, to be $168,803. It is agreed, for this case, that Neon (or Dynamics) had no income subject to income tax in the years 1955–1957 which could be used to absorb any net operating loss suffered in 1954.

32. In the event that it is concluded as a matter of law that the compromise payment of $400,000 must be considered as a repayment of the dividend, required to have been reported as such by Neon, the $400,000 is, therefore, not allowable as a deduction in 1954. Then there is no amount to be carried forward as a 1954 net operating loss carryover to 1958, and no amount from 1954 shall be allowed as a net operating loss deduction in 1958. The facts agreed to in the

foregoing sentence apply only to disallowance of the $400,000 deduction in full.

33. The Commissioner of Internal Revenue held in the Revenue Agent's Report dated July 30, 1965, that the $400,000 paid by Neon to Reeves-Ely in 1954 was a contribution of capital by Neon to Reeves-Ely.

34. The by-laws of Neon (Article XIII) contained, after April 21, 1942, indemnification provisions which were also in effect during the entire calendar year 1954. These provisions indemnified each director and officer of the corporation against expenses reasonably incurred in connection with a court action in which he is made a party by reason of his having been a director or officer and where there is a settlement in such action, approved by a court of competent jurisdiction, for his pro rata share of such settlement, assuming that he had no financial interest adverse to the company in such actions.

### 1955 NET OPERATING LOSS

35. The separate tax return filed by the plaintiff for the taxable year 1955 disclosed a net operating loss for that year. After audit, agreed Internal Revenue Service adjustments were made, and that loss is now in the amount of $113,365.03.

36. Attached to the claim for refund of 1958 taxes filed by Dynamics on June 27, 1967, was a statement of the grounds therefor. The claim refers among other things to a net operating loss for 1954 in the amount of $363,152.65. It notes that a previously filed refund claim for the year 1953 claimed the 1954 net operating loss as a carry-back together with additional depletion for 1954 and 1955. It also notes that a Revenue Agent's Report was issued covering the years 1953 through 1957, which reduced the said 1954 loss to $137,659.12. One of the adjustments producing the reduction was the disallowance of $400,000 incurred in the above described settle-

---

4. Because of the 85 percent dividends received credit, Dynamics' taxable income for 1953 was only increased by 15 percent of the $880,400.70 received from Reeves-Ely.

ment of a minority stockholders' derivative suit claimed as a deduction. Taxpayer asserted that the $400,000 item was properly deductible, creating an operating loss for 1954 of $537,659.12. The claim also noted that taxpayer was then litigating the right to carry-back the 1954 loss to 1953 and wished to protect itself by asserting its right to carry forward the 1954 net operating loss to the year 1958. The claim then recomputed the tax liability for 1958 on the basis of a carry-forward operating loss of $537,659.12 and a capital gain adjustment in 1958, which together resulted in a claimed tax overpayment for 1958 of $362,393.74.

37. The Revenue Agent's Report dated July 30, 1965, covered an audit of the separate returns for 1953–1957 of Neon and Dynamics. The report recognized and allowed the 1955 net operating loss in the amount of $113,365.03 and carried it back to 1953 where it was absorbed without yielding any tax benefit.

## ULTIMATE FINDINGS AND CONCLUSIONS

■ 38. In 1951 the real property known as 215 E. 91st Street was contributed to Reeves by its then parent, Neon, at a time when that property was needed by Reeves for its manufacturing operations. Beginning about the middle of 1956, Reeves began to move its entire manufacturing operations from 215 E. 91st Street to a new plant at Roosevelt Field, and by mid-January 1958, this move had been substantially completed except for Reeves' executive offices and some accounting activities which themselves were scheduled to move by March 1, 1958.

As a result of its move to Roosevelt Field, it became apparent that Reeves had no further use for the premises at 215 E. 91st Street. Accordingly, after an abortive attempt by Reeves to sell the property in late 1957, it was decided to reconvey the property to Reeves' then parent, Dynamics, successor to Neon by merger, as a dividend in kind. Following the adoption of appropriate resolu-

tions by Reeves' board of directors, title to 215 E. 91st Street was conveyed by Reeves to Dynamics. Thereafter, Dynamics obtained some rentals from the property, but was primarily interested in selling it. Sale efforts were instituted, and in November 1958, 215 E. 91st Street was sold by Dynamics to an unrelated third party at a substantial gain. There is no evidence to suggest that when Reeves conveyed the property to Dynamics in February 1958, either corporation was aware of the possibility of this sale some nine months later. *Cf.* Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945) and Commissioner of Internal Revenue v. Transport Trading & Terminal Corp., 176 F.2d 570 (2d Cir., 1949), cert. denied, 338 U.S. 955, 70 S.Ct. 493, 94 L.Ed. 589 (1950).

The decision to transfer this real estate back to the parent holding company may be inferred to have been motivated by both business and tax considerations. *Cf.* Rothschild v. United States, 407 F.2d 404, 186 Ct.Cl. 709 (1969). From a business point of view, there would appear to be some selling advantage inhering in ownership by a pure holding company, such as Dynamics, rather than by a purely manufacturing concern, such as Reeves. Dynamics could afford to devote more time and attention to the problem of selling real estate, or perhaps, if no satisfactory sale could be obtained, converting it entirely to rental property. From the tax standpoint, on the other hand, the overall corporate group stood to benefit from a sale by Dynamics rather than by Reeves. This is because, in 1958, Dynamics possibly had a capital loss carryover against which to apply any gain on the sale, whereas Reeves clearly had no such carryover. However, on the entire stipulated record, it has been concluded that the business motivations for the transfer were primary and that the sale of 215 E. 91st Street was in substance what it was in form, namely, a sale by Dynamics, not by Reeves.

Accordingly, in its 1958 consolidated income tax return, plaintiff properly re-

**412**

ported the gain realized on the sale of 215 E. 91st Street, offset by plaintiff's capital loss carried forward from 1957. The defendant erred in reallocating such gain to plaintiff's subsidiary, Reeves, the former owner of the property.

39. It has been stipulated that, so far as defendant Neon was concerned, the settlement of the *Hirsh* suit, as referred to above, was made in good faith, primarily to enable it to protect its business, its reputation, and its good will, and to avoid lengthy litigation together with added legal expenses and the possibility of exposure to greater liability as well as publicity which was unfavorable to the corporate reputation and to enable the corporation to resume normal business operations. The payment of $400,-000 in settlement was directly connected with and proximately resulted from the corporation's business activity.

 40. Defendant in no way disputes the well-settled rule that a payment made by a corporation in settlement of a stockholders' derivative suit against it constitutes an ordinary and necessary business expense, and by the above stipulation, defendant concedes that the $400,000 payment in settlement of the *Hirsh* suit was an ordinary and necessary business expense. *See,* C. Ludwig Baumann & Co. v. Marcelle, 203 F.2d 459 (2d Cir., 1953); Federation Bank & Trust Co. v. Commissioner, 27 T.C. 960 (1957), aff'd 256 F.2d 764 (2d Cir., 1958) and Great Island Holding Corp., 5 T.C. 150 (1945), Acq.1945 C.B. 3. Nonetheless, defendant contends, a close analysis of the nature of the $400,000 payment discloses that its deductibility under the above cited rule is limited by the strictures of the so-called "tax benefit rule" as developed by such cases as Arrowsmith v. Commissioner of Internal Revenue, 344 U.S. 6, 73 S.Ct. 71, 97 L.Ed. 6 (1952); United States v. Skelly Oil Co., 394 U.S. 678, 89 S.Ct. 1379, 22 L.Ed. 2d 642 (1969); and Mitchell v. Commissioner of Internal Revenue, 428 F.2d 259 (6th Cir., 1970), cert. denied, 401 U.S. 909, 91 S.Ct. 868, 27 L.Ed.2d 807 (1971). That rule provides, in short,

that to the extent a deduction was taken in the previous year, income must be recognized in a later taxable year when the item previously deducted is recovered. *See,* Alice Phelan Sullivan Corp. v. United States, 381 F.2d 399, 401, 180 Ct.Cl. 659, 663 (1967). Defendant would apply the rule to this case in an unusual, but in my opinion, correct fashion.

The argument is that the $400,000 compromise payment in 1954 was "integrally related" (Df.'s Br. p. 18) to the dividend received by plaintiff from Reeves-Ely in 1953 which this court has held was in the amount of $880,400. Dynamics Corp. of America v. United States, *supra.* Accordingly, the 1954 payment is to be characterized as the return of a part of that dividend, and plaintiff is entitled to deduct only that portion of the payment which was includible in its 1953 taxable income. Under section 26 of the 1939 Internal Revenue Code (applicable at the time), plaintiff was entitled to the dividends-received credit of 85 per centum of all amounts received as dividends from domestic corporations. 26 U.S.C. § 26(b) (1952). Under the doctrine of the *Skelly Oil Co.* decision, *supra,* the conclusion follows that plaintiff's deduction of the 1954 compromise payment is limited to $60,000 (15 percent of $400,000). Such reduction in the amount of the deduction results in no recovery to plaintiff under Counts II and III of its petition, as amended.

### CONCLUSION OF LAW

Upon the foregoing findings of fact and conclusions of law, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover under Count I of its petition, the amount of recovery, if any, to be determined in further proceedings under Rule 131(c). Plaintiff is not entitled to recover under Counts II and III of its petition, as amended, and as to those counts, the petition is dismissed.