**AGWAY, INC., Successor to Cooperative Grange League Federation Exchange, Inc.**

v.

**The UNITED STATES.**

No. 302–72.

United States Court of Claims.

Oct. 22, 1975.

Mac Asbill, Jr., Washington, D. C., attorney of record for plaintiff; William A. Sutherland, James F. Jorden, Rufus E. Brown, and Sutherland, Asbill & Brennan, Washington, D. C., of counsel.

Charles E. Auslander, Jr., Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, for defendant; Theodore D. Peyser, Jr., John E. Evans, Washington, D. C., of counsel.

Before DURFEE, Senior Judge, and NICHOLS and KASHIWA, Judges.

ON DEFENDANT'S MOTION AND
PLAINTIFF'S CROSS MOTION
FOR SUMMARY JUDGMENT

NICHOLS, Judge.

This tax refund suit for $28,044.19 (and statutory interest) comes before the court on cross motions for summary judgment on the sole remaining issue in the case: whether plaintiff's $43,480 gain on the redemption of preferred stock in an agricultural cooperative is taxable as ordinary income or as capital gains (long-term).

The stock that was redeemed in taxpayer's 1960 fiscal year, at $100 face value per share, was originally issued in 1957, valued by plaintiff and defendant then at $60 per share on audit after extended negotiations, and taken into income at that figure. Plaintiff contends that the $40 per share gain on the redemption of the stock over its 1957 fair market value (FMV) of $60 is either a capital gain or a tax-free, basis-reducing return of capital. Defendant contends that the $40 per share gain is simply ordinary income to plaintiff for a series of reasons discussed below. Plaintiff has paid the tax assessed and sues for refund. We hold for plaintiff that its gain is a capital gain, following the Fifth Circuit decisions in *Tomlinson v. Massey,* 308 F.2d 168 (1962); and *Raley v. United States,* 491 F.2d 136 (1974).

I

Plaintiff is a Delaware corporation, doing business as a farmers' cooperative in New York and successor since July 1, 1964, to Cooperative Grange League Federation Exchange, Inc., which was both organized as a New York corporation and did business in New York. Exchange's principal business for the tax year in question was the manufacture and purchase of farm supplies, equipment and petroleum products and the sale of such items either directly to its farmer patrons or to various retail outlets which, in turn, sold them to farmers.

Exchange kept its books on an accrual basis with a July 1–June 30 fiscal year. It is Exchange's 1960 fiscal year (July 1, 1959–June 30, 1960) that is in issue. Hereinafter the word "Exchange" may refer to plaintiff, and vice versa.

Plaintiff was also a patron of United Co-Operatives, Inc., organized as an Indiana farmers' cooperative corporation. United operates on an accrual basis using a November 1–October 31 fiscal year, making its patronage refunds annually on approximately October 31. This case concerns the stock transactions between United and plaintiff.

Article 7 of United's By-laws governed the stock transactions in issue, and so far as relevant provide as follows: (1) Section 5 (of Article 7) makes all capital contributions (including plaintiff's preferred stock before redemption) "subject to all the risks and contingencies incident to the investment of capital in corporations." (2) Section 6 requires patronage refunds to be paid annually on the basis of a single year's volume of business. (3) Section 7 allows patronage refunds to be paid out in a wide variety of forms, including cash, stock, and other "paper". (4) Section 10 requires that capital contributions be assessed on the basis of the last *3 years* volume of business. (5) Section 11 allows patronage refunds to be used to meet capital contributions—the patrons receiving "paper" or stock in lieu of cash as a result of crediting patronage refunds to obligatory capital contributions. (6) Section 13 acknowledges the cooperative's obligation to pay back eventually all net margins and capital contributions to the patrons (assuming the cooperative stays solvent). (7) Sections 14 and 15 qualify this pay-back right by reserving to the Board of Directors' judgment the decision when and if to pay back retained profits and capital contributions. Capital advances are retired in the order received.

During Exchange's fiscal year 1960, the following stock transactions with United occurred:

1. About October 31, 1959, United distributed 2,193 shares of preferred stock to Exchange as part of its annual patronage refund pursuant to Article 7 of the By-laws.

2. About February 1, 1960, United redeemed 1,087 shares of preferred stock from Exchange for $108,700.

The redeemed stock had been acquired about October 31, 1957, as part of the annual patronage refund for that fiscal year of United.

The following table displays the effects of these two stock transactions on Exchange's share of United's preferred stock:

| | Shares | Percentage of outstanding stock |
| --- | --- | --- |
| Before Oct. 31, 1959 | 3,480 | 17.4 |
| After Oct. 31, 1959 | 5,673 | 18.0 |
| After Feb. 1, 1960 | 4,586 | 16.1 |

During this same fiscal year 1960 Exchange held a constant total of 100 shares of Class A common stock also, which at all times was less than 6% of the outstanding Class A common stock. Exchange held no Class B common stock during this period.

The exclusive voting rights were in the A stock. The C stock (preferred stock) was freely transferrable. It paid dividends not over 4% per annum. On liquidation, the C stock, plus accumulated dividends took precedence over common stock and patronage distributions.

Joint Exhibit K, which lists plaintiff's transactions in the preferred stock (issued as patronage refunds by United) discloses the uncertain nature of preferred stock redemptions:

| Preferred Stock Fiscal Years | Issued | Redeemed |
| --- | --- | --- |
| 1942–1953 | About 4,000 shares | 42 shares. |
| 1954–1956 | None | About 3,000 shares. |
| 1957–Jan. 1960 | About 5,700 shares | About 1,500 shares. |

Thus the capital needs of United resulted in Exchange holding about 5,000 shares at the end of 19 years membership in United. All previous redemptions had effectively been cancelled by subsequent stock patronage refunds, prior to the stock redemption here about February 1, 1960. Defendant has offered no specific evidence to establish any motive of tax avoidance or tax evasion in the operation of the above stock issuance and redemption program.

The adjustment on audit of 1957 taxes reflected an addition of $60 a share to plaintiff's ordinary income.

II

The first substantial issue in this case is to determine the applicable Code Section of Subchapter C of the 1954 Internal Revenue Code (IRC, also Title 26 of U.S.C.).

Although defendant makes a point that we should totally reject Subchapter C, as governing, because United was not a for-profit corporation, no statutory or case law citations are presented to support such an extraordinary contention. Further it is clearly stipulated that plaintiff and United both operated as

corporations under their respective state laws. No evidence to support a holding that the corporations were mere shells or dummies is presented. Consequently the defendant's assertions are rejected without further consideration.

Plaintiff presents two alternative arguments: one is that the transactions are to be treated as true capital-gain redemptions under Subchapter C, § 302; the other is that the redemptions are to be treated as non-dividend distributions under § 301. These arguments cannot both be right. Under § 301(a), § 301 does not apply if the chapter otherwise provides. In § 302 it does so otherwise provide (with certain stated exceptions) in the case of a redemption. The definition in § 317(b) holds that if a corporation acquires its stock from a shareholder in exchange for property (which includes money) it is a redemption.

The facts of this case establish that plaintiff's redemption of stock (by United) is in § 302(b)(1) language a redemption "not essentially equivalent to a dividend." As a consequence plaintiff is not excluded from § 302(a) capital gain treatment, assuming (as discussed below) plaintiff meets other statutory requirements for capital asset as opposed to non-capital asset treatment. By § 302(b)(5) meeting this test suffices though other tests under (b)(2), (3) and (4) are not met. By § 302(d), § 301 applies only if § 302(a) does not apply, but here it does apply because of § 302(b)(1).

The test for what is "essentially equivalent to a dividend" (for purposes of § 302(b)(1)) was discussed at length in *Himmel v. Com'r*, 338 F.2d 815 (2d Cir. 1964). The court stated a twofold test, at 817:

> The hallmarks of a dividend, then, are pro rata distribution of earnings and profits *and* no change in basic shareholder relationships.

It has already been noted that the redemption shifted plaintiff's portion of the outstanding stock only from 18.0% to 16.1%, a mere 1.9% shift which is not "substantially disproportionate" § 302(b)(2), and a non-significant change in basic shareholder relationships under the facts of this case. However, the By-laws effectively preclude meeting the first part of the twofold test: pro rata distribution.

A pro rata distribution would occur only if every stockholder had X number of shares redeemed for every share of preferred stock held. This cannot be.

Section 14 of Article 7 of the By-laws requires that "capital advances shall be retired in the order in which they have been received." All or the same proportion of all shares issued in a single year must be redeemed together.

Under Section 14, the only way a distribution could be pro rata across the class of stock is if every stockholder received the same number of shares in each year of issue.

To receive the same number of shares in each year of issue, under Section 10 of Article 7 of the By-laws, each shareholder must do exactly the same amount of business volume every year "for the last three years," for the same number of three year periods (over at least the 1942–1960 period that plaintiff participated).

This, in fact, has not occurred. Patrons do differing amounts of business each year. Patrons come and go from the cooperative. Thus the redemptions here involved cannot be dividends.

This case is easily distinguishable from § 302(b)(1) cases involving corporations with related shareholders where "attribution" under § 318 applies. *See, United States v. Davis*, 397 U.S. 301, 90 S.Ct. 1041, 25 L.Ed.2d 323 (1970); *Albers v. Com'r*, 414 U.S. 982, 94 S.Ct. 279, 38 L.Ed.2d 225 (1973, dissent to refusal of certiorari to reconsider *Davis* by Justices Douglas, Blackmun, and Powell). It is clear from the prevailing opinion in *Davis* that in the absence of attribution the result would be the same as here.

(Our result here also meets plaintiff's counsel's prelitigation expectations. See footnote 2, Mac Asbill, Jr., "1962 Act:

New tax on coops will bring drastic changes in operation, financing," 17 Journal of Taxation, 325–326 (1962). Counsel wrote: "It would seem that, in the normal case, the gain realized on disposition of the stock would be capital gain. * * * *See Tomlinson v. Massey,* * * * *".)

Under authority of *Tomlinson v. Massey, supra,* and *Raley v. United States, supra,* and agreeably to the above analysis, the plaintiff should therefore be taxed at capital gains rates unless the defendant prevails with one of the three reasons it has adduced for taking the case out of the general rule and making the gains ordinary income.

### III

▮ Defendant's first argument is that its 1959 changes in the Regulations should be applied. The Regulation, Treasury Regulation on Income Tax, § 1.61–5, published December 3, 1959, provides that amounts allocated to customers by cooperatives on a patronage basis shall be ordinary income, to the extent of fair market value in the case of stock and in case of redemption of stock, to the extent of the excess over the amount previously taken into income.

The Congress by Pub.L. 87–834, 76 Stat. 1045, IRC §§ 1381–1388, effective December 31, 1962, amended the statute in the same substance as the Regulation, so the instant controversy cannot now arise.

The defendant's argument relies on IRC § 7805(b) which provides:

* * * The Secretary or his delegate may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect.

This statute authorizes him to limit retroactive effect, not to add retroactive effect that a Regulation would otherwise not have.

The Regulation specified its own retroactivity (U.S.Code & Adm.News Fed.Tax Reg. (1960) p. 72 § 1.61–5(c)):

* * * If, for any taxable year ending before the date of publication of this paragraph in the Federal Register as a Treasury Decision, a taxpayer treated any patronage dividend received in the form of a document * * * in accordance with the regulations then applicable * * * such taxpayer is not required to change the treatment of such patronage dividends for any such prior taxable year. * *

With respect to paper issued before 1959 both *Tomlinson* and *Raley, supra,* denied application to the change in Regulations in 1959, which made an about face from treating patronage dividend paper as a capital asset for redemption purposes to treating it as an ordinary income asset at redemption, though in *Raley* the redemption was after 1959. This result was based on general retroactivity principles and the view that the attempted retroactive application was contrary to the statute then governing.

We also join the Fifth Circuit in rejecting such retroactive application of the 1959 Regulations. For reasons elaborated below, we think the situation presents an exceptionally strong case for application of *stare decisis,* and for not going into conflict.

### IV

▮ Defendant next seeks to apply the tax benefit rule to this case. However, defendant misreads the rule.

The tax benefit rule is of judicial origin and has been applied to several types of situations. Application here would lack support in decided cases and be wrong on principle.

Three cases arose under the provisions of IRC §§ 336 and 337 for non-recognition of gains or losses in corporate liquidations: (a) *Citizens Federal S. & L. Ass'n of Cleveland·v. United States,* 290 F.2d 932, 154 Ct.Cl. 305 (1961); (b) *West Seattle Nat'l Bank of Seattle v. Com'r,* 288 F.2d 47 (9th Cir. 1961); and (c) *Anders v. United States,* 462 F.2d 1147, 199 Ct.Cl. 1, *cert. denied,* 409 U.S. 1064, 93 S.Ct. 557, 34 L.Ed.2d 517 (1972).

Both *Citizens* and *West Seattle* applied the tax benefit rule to require unused bad debt reserves to be taken as income in the year of liquidation of the bank, despite §§ 336 and 337. *Anders* went beyond the statute to exclude from § 337 nonrecognition treatment the bulk sale of certain inventory items (towels) that taxpayer had already fully "expensed" and reduced to a zero basis (by deducting as a business expense rather than a capital investment). In *Anders* the court was following the same result as achieved in the companion case, *Com'r v. Anders,* 414 F.2d 1283 (10th Cir.), *cert. denied,* 396 U.S. 958, 90 S.Ct. 431, 24 L.Ed.2d 423 (1969).

In *Arrowsmith v. Com'r,* 344 U.S. 6, 73 S.Ct. 71, 97 L.Ed. 6 (1952), taxpayers who had been taxed on gains from liquidating a corporation at the capital gains rate were held required to treat as a capital loss sums they later paid as transferees to settle an unforeseen liability of the same corporation.

In *Dynamics Corp. of America v. United States,* 449 F.2d 402, 196 Ct.Cl. 282 (1971), we held that a payment to compromise a lawsuit, otherwise deductible as an ordinary and necessary business expense, was not deductible to the extent it was essentially a refund of a dividend, on which the 85% corporate dividends received credit had been taken.

Two other cases of the unexpected return type are *United States v. Skelly Oil Co.,* 394 U.S. 678, 89 S.Ct. 1379, 22 L.Ed.2d 642 (1969), and *Alice Phelan Sullivan Corp. v. United States,* 381 F.2d 399, 180 Ct.Cl. 659 (1967). In *Skelly Oil* taxpayer was allowed a deduction for a court-ordered rebate to customers (on petroleum sales) only to the extent that these amounts had not been previously exempted from tax under the oil depletion allowance. In *Alice Phelan,* we held that the return of a charitable gift for which a deduction had been taken (through unexpected failure of the trust) resulted in income to the donor.

The tax benefit rule has no application in decided cases to a situation where an asset is given on audit a value for some tax purpose, and the taxpayer realizes more on subsequent sale or exchange. There is no need for courts to formulate a rule here because gains of this kind are always foreseen as possible, and the tax laws make full provision for them. Here we are being asked to substitute a rule of our formulation for the one Congress has prescribed.

V

 Defendant asserts that we should apply the *"Corn Products* doctrine". *Corn Products Refining Co. v. Com'r,* 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955). The Court held that partial hedging transactions, purchase of corn futures (to guard against price rise only), by a manufacturer, whose raw material is the commodity being traded, are treated as if they were inventory and not as a capital asset, notwithstanding the definition of "capital asset" in IRC § 1221 and its predecessor which does not literally exclude the futures in the list of exclusions such as stock in trade, etc. Gains and losses on disposal of futures not required in the business were therefore ordinary income or loss.

*Corn Products* has been applied in lower courts in a variety of situations which possibly might surprise the *Corn Products* court, and we are concerned with only one of these ramifications here, and may properly disregard all the others. This is the "source of supply" line of cases holding or refusing to hold that when a taxpayer acquires stock of another company to obtain a dependable source of supply of components for manufacture, or articles for sale, such a purchase is or is not an ordinary expense of the business rather than a capital investment. Cases in this court are: *Booth Newspapers, Inc. v. United States,* 303 F.2d 916, 157 Ct.Cl. 886 (1962); *FS Services, Inc. v. United States,* 413 F.2d 548, 188 Ct.Cl. 874 (1969); *Waterman, Largen & Co. v. United States,* 419 F.2d 845, 189 Ct.Cl. 364 (1969), *cert. denied,* 400 U.S. 869, 91 S.Ct. 103, 27 L.Ed.2d 109 (1970); and *Dearborn Co. v. United States,* 444 F.2d 1145, 195 Ct.Cl. 219 (1971).

The obvious argument for defendant here is that taxpayer had no intent to invest in the preferred stock and acquired it only as an unavoidable incident to using United as a source of supply. Unlike the cases cited, however, the record here offers no direct evidence of taxpayer's subjective intent. Presumably defendant would treat all holders of the stock alike whatever their private thoughts about it might have been.

The first three cases cited above follow *Corn Products* to hold that purchases of stock of suppliers was without investment intent and therefore, losses on resale were ordinary and not capital losses, sustaining, of course, the taxpayer's position. *Dearborn* holds to the contrary. It is therefore pertinent to the instant case to determine how we distinguished the facts there found from the three prior holdings.

In *Dearborn* the court held that in purchasing stock in a woodwork company plaintiff, a furniture company, though partly seeking a dependable source of supply had "substantial investment purpose" (444 F.2d at 1148, 195 Ct.Cl. at 224), in that it intended to operate the company "as a permanent, profitable business in its own right", to "receive dividend income", and to make fee income from managing the new subsidiary. The stock acquisition was meant to be permanent, not to be sold when the components ceased to be in short supply.

In *Waterman, Largen* the stock purchase was to obtain a source of employment of the plaintiff company as a commission selling agent of wool and synthetic yarns. The court, accepting plaintiffs' testimony as to their subjective intent, found from this and from surrounding circumstances, including the unattractiveness of the stock as an investment, that plaintiffs did not have investment intent. No language can be found stating there was no investment intent at all, but the majority could not have deemed such intent substantial or the same judges would not, just a year and a half later, have decided *Dearborn* as they did. *See* Finding 29 in *Waterman, Largen.*

The rule can be stated to be, and we believe is, that *Corn Products* will be applied in this court to purchases of company stock to obtain a source of supply, only if there is no substantial investment intent. It is futile to analyze the cases in further detail because it is obvious that determining intent will involve very different considerations when the stock is acquired, not all at once, but intermittently as part of the patronage refunds of a cooperative, and where obtaining control is not a factor. Since the necessity of taking refunds in part in paper is inherent in purchasing from such a cooperative, our search for the decisive intent is transferred to the decision to purchase through the cooperative system, and away from the acceptance of the paper, which has become unavoidable. In fact, one can go further and say the intent in joining such a scheme is essentially, the intent of Congress in creating it, and therefore, the participant could not be heard to say his subjective intent was other than what Congress meant to bring about. The necessity of the cooperative floating its paper to its customers derives from the requirements of Congress, IRC § 521(b)(2).

Defendant's *Corn Products* analysis here is thus contrary to and refuted by *United States v. Mississippi Chemical Corp.,* 405 U.S. 298, 92 S.Ct. 908, 31 L.Ed.2d 217 (1972). In that case the taxpayers, cooperatives, borrowed money at low interest rates from one of the statutory Banks for Cooperatives, and, under the law, were required to buy Class C stock quarterly in the bank, in a fixed amount measured by the amount loaned. This stock paid no dividends and virtually had no market. Taxpayers contended it really represented additional interest, and except for a nominal amount its purchase price was deductible as interest. The case before us now was suspended to await the result in the Supreme Court in the *Mississippi Chemical*

case. The Supreme Court held the stock was a § 1221 capital asset, and said that, viewing it as part of the statutory scheme as a whole, it had real value to the cooperative to which it was issued. Congress might have just required a higher interest, but the parties could not participate in the scheme and yet reject the form in which Congress chose to cast it. *Corn Products* is not mentioned expressly, but it is clear that the Supreme Court could not have applied the analysis it did, if it had deemed that *Corn Products* applied, nor could it have said the stock was a § 1221 capital asset.

Our previous decision to the contrary on almost identical facts, *Penn Yan Agway Coop. v. United States,* 417 F.2d 1372, 189 Ct.Cl. 434 (1969) is referred to in a footnote in the *Mississippi Chemical Corp.* case, and must be regarded as disapproved. Neither party cites it here and we do not think it is necessary to convene an *en banc* court to overrule it formally.

It is also worth noting that the plaintiff here filed a brief amicus in the *Mississippi Chemical* case.

In *Tomlinson v. Massey, supra,* the United States cited *Corn Products* to support its argument that the cooperative paper there involved was not a capital asset, but the court held it was. This paper was sold at 20% of face, not redeemed, and as it had no ascertainable market value up to its sale, unlike the paper here, defendant's argument here would seem to have less plausibility than it had there. *Raley v. United States, supra,* does not expressly refer to *Corn Products* but may be deemed to approve the part of the previous decision dealing with *Corn Products,* as it does other parts. The court in *Raley* mentions in its fn. 2 that the case now before us was, according to information furnished by the Attorney General, the only case of the kind pending in any court of the United States.

The fundamental error with the defendant's argument for the *Corn Products* doctrine is that, if the doctrine were applied by us solely on the strength of a cooperative's serving as a supplier to its patrons, (and the argument has no other basis) we would be effectively holding that cooperatives and their patrons could not hold capital stock as a capital asset, and this would be a fundamental change in the tax law without any statutory justification. It would negate § 521(b)(2) and render the 1962 amendments (§§ 1381–1388) needless. We find no statutory support for such a change, and we are given no compelling precedent of the Supreme Court either. Rather, as the Court did in *Mississippi,* we seek the result that best conforms with existing statutes laid down by Congress. Congress is the lawmaker—not we in the judiciary.

## VI

██ This case is an example of the defendant's relitigation policy, which has recently been harshly criticized in the *Preliminary Report of the Commission on Revision of the Federal Court Appellate System* (April 1975) A–92 and ff. Since defendant came before us on issues it had lost (or failed to raise) in but one other court, this is not an extreme example in that regard. Compare our recent unpublished order in *National Life Ins. Co. v. United States,* No. 85–72, June 27, 1975, citing four previous losses by defendant on the issue there litigated.

This case is peculiar however, in that if the information given the Fifth Circuit in *Raley, supra,* was correct, this is the very last case involving the tax status of pre-1959 cooperative paper. Defendant in 1962 had the applicable law rewritten to its specifications, so the issue as presented here has no current importance. The case has attractiveness as one for the tax buff to sharpen his perceptions on, and that may be why defendant has labored so hard to bring about a conflict between the last and next to last cases in this field.

The plaintiff has not asked us to extend the collateral estoppel doctrine of *Blonder-Tongue Labs. v. University of Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971) to tax litigation. If the *Commission on Revision* is right, the evils the Supreme Court took arms against in *Blonder-Tongue* obtain equally here. No doubt, however, it would require a tribunal having the powers the Supreme Court enjoys to overrule past precedent, to make the extension suggested. It may occur some day. The limited impact of collateral estoppel in Federal tax cases under present decided law is illustrated in *Phipps v. United States,* 515 F.2d 1099, 206 Ct.Cl. 583 (1975). Meanwhile, we think that for the lower courts a deference to *stare decisis* that would otherwise seem exaggerated, not a defiance of the principle, is our best defense against needless litigation. As to other Federal courts, our reluctance to go into conflict should be likewise great.

A characteristic of the relitigation policy not mentioned by the *Commission* is the assertion of new legal grounds in relitigated cases. *National Life Ins. Co., supra,* affords an example of this, and so is the invocation here of the tax benefit rule. We think *stare decisis* ought to apply in tax cases to the result as well as the reasoning used to reach it, even if more weakly, and it should not be readily avoided by new legal contentions that could have been made in the prior case. That is, the legal status of, *e. g.,* cooperative paper ought not to vary from tribunal to tribunal merely according to the arguments Government counsel chooses to make.

Our use of the precedents in this and other courts has been in accordance with the above stated principles.

## CONCLUSION

Accordingly the defendant's motion for summary judgment is denied. The plaintiff's motion for summary judgment is allowed, and the cause is remanded to the trial division for further proceedings under Rule 131(c) to determine the amount of the judgment to be entered for the plaintiff.

DURFEE, Senior Judge (concurring in part and dissenting in part):

I concur with the result in the majority opinion by Judge Nichols. Judge Kashiwa, in his dissent, agrees with the majority that "the rule can be stated to be, and we believe is, that *Corn Products* will be applied in this court to purchase of company stock to obtain a source of supply *only if there is no substantial investment intent*", *infra,* p. 1204 (Emphasis supplied).

Apart from any distinction drawn by Judge Kashiwa from *United States v. Mississippi Chemical Corp.,* 405 U.S. 298, 92 S.Ct. 908, 31 L.Ed.2d 217 (1972) and the present case, the Court there did say, "The stock has value because it is the foundation of the corporate scheme; it insures stability and continuity." 405 U.S. at 311, 92 S.Ct. at 916. Judge Kashiwa's opinion is that "the stock involved in *Agway* does not provide a foundation and stability for United. On the contrary, it is intended that the patronage dividend stock be redeemed when the capital is considered adequate. This is in the by-laws." *Infra,* p. 1205.

When plaintiff paid for market value for the products it purchased from United Cooperative, rather than their actual cost to United, this was a capital investment by which plaintiff acquired its preferred stock, not merely a purchase of corn futures designed to protect itself against price increases and to insure its continued supply requirements as intended in *Corn Products.* In my opinion, the value of plaintiff's preferred stock was that it did "insure stability and continuity" and "the foundation of the corporate scheme", so considered in *Mississippi Chemical Corp.*

Article 7, Sec. 5 of the by-laws, *also* provided that all capital contributions, including plaintiff's preferred stock before redemption are "subject to all the

risks and contingencies incident to the investment of capital in a corporation." Under the *Corn Products* rule that we agree is to be applied "to the purchase of company stock to obtain a source of supply", this by-law supplies convincing evidence of "substantial investment intent."

I do not join in Judge Nichols' criticism of the "defendant's relitigation policy which has recently been harshly criticized in the Preliminary Report of the Commission on Revision of the Federal Court Appellate System (April 1975) A–92 and ff." Part VI, p. 12, *supra.* With all deference to this Preliminary Report and to application of the rule of *stare decisis* for lower courts, and since this is the very last case involving the tax status of pre-1959 cooperative paper, I believe that any extensive criticism of the Government's defense as "an example of defendant's relitigation policy", may well await another day and another case more effective as future precedent.

KASHIWA, Judge (dissenting):

My only point of dissent with the majority opinion is the application of the *Corn Products* [1] doctrine to this case. The majority states, and I agree that:

> The rule can be stated to be, and we believe is, that *Corn Products* will be applied in this court to purchases of company stock to obtain a source of supply only if there is no substantial investment intent.

The majority then looks at the intent involved in the decision to purchase through the cooperative system. However, the majority opinion does not look at the taxpayer's intent but transfers the intent to Congress under Int.Rev. Code of 1954, § 521(b)(2) making it necessary for a cooperative to float its paper to its customers. The majority analyzes *United States v. Mississippi Chemical Corp.,* 405 U.S. 298, 92 S.Ct. 908, 31 L.Ed.2d 217 (1972), and seems to conclude that since the Supreme Court ex-

amined the case based on Congressional intent in setting up the Banks for Cooperatives and since the Court did not apply *Corn Products,* it is not applicable in the present case, or perhaps in any case, where there is Congressional involvement.

However, *Mississippi Chemical* is very much distinguished from *Agway.* The Banks for Cooperatives were established by the Farm Credit Act of 1933 as a financing vehicle for farmers with the long-term purpose that they would finance themselves. The intent of Congress was to stimulate a privately financed program, but temporary public financing was needed at the outset to get the system into successful operation. The Farm Credit Act of 1955 provided for three distinct classes of stock—A, B, and C. Class C stock was involved in that case and could be obtained under four circumstances:

(1) initial qualifying share

(2) quarterly stock purchases

(3) patronage refunds

(4) allocated surplus credit

The only circumstance involved there was number 2. The Court did not consider patronage refunds. In footnote 10, the Court referred to them as distributions of earnings eventually convertible to cash. In footnote 11, the Court indicated that it was not reviewing the contention that the patronage dividends should have been reported as income. This is very clear from the lower court's opinion, reported at 431 F.2d 1320 (5th Cir. 1970), wherein it is stated at page 1322:

> * * * In the district court the government also contended that taxpayers should have reported the Class C stock received as patronage refunds as income. The court did not sustain this position and it has been abandoned by the government. As a result the present appeal is concerned solely with the tax treatment of the Class C stock purchased under the "interest

---

1. *Corn Products Refining Co. v. Com'r,* 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955).

override" requirements of 12 U.S.C. § 1134d(a)(3). [Footnotes omitted.]

The Court considered that there was virtually no market for the C shares but that the stock was intentionally given its characteristics by Congress with definite reason. Congress wanted the Banks to repay the capital extended by the Government and to retain private capital and this would not be facilitated if borrowers could redeem their stock for cash upon paying off their loans. The restrictions on the stock would provide a stable membership and permanent capital. The amount paid for C shares in quarterly purchases becomes part of the permanent capital structure of the Bank. The Court states 405 U.S. at page 311, 92 S.Ct. at p. 916: "The stock has value because it is the foundation of the cooperative scheme; it insures stability and continuity."

Two points should be considered: (1) the Court never considered a capital versus non-capital argument and never even mentions *Corn Products* but only considered the deducted versus capitalized argument, and (2) the Court kept talking about long-term value, foundation, and stability. Since the Court did not consider the argument presented in *Corn Products* and since it does not even mention that case, it is unreasonable to say that the Court has overruled it or even that it refutes it. Secondly, the stock involved in *Agway* does not provide a foundation and stability for United. On the contrary, it is intended that the patronage dividend stock be redeemed when the capital is considered adequate. This is in the by-laws.

Concerning Congressional intent, in *Mississippi Chemical* there was the intent of Congress to make the Banks for Cooperatives self-sustaining and to make the

Class C stock part of the permanent capital structure. In order for a Bank to lend money, it had to have a continuing supply of capital. This was brought about by purchases of Class C stock. However, in *Agway* there is no similar Congressional intent. There is no Congressional involvement with United other than the establishment of tax-exempt status under § 521 of the Code. There is no need for the patronage dividends to be part of the permanent capital structure. In fact, according to Article 7, section 14, of United's by-laws, capital advances would be retired when United's capital was adequate in the judgment of the board of directors.

Therefore, it would seem that, rather than *Mississippi Chemical, Corn Products* and prior cases of this court applying the *Corn Products* doctrine. *Waterman, Largen & Co. v. United States,* 419 F.2d 845, 189 Ct.Cl. 364 (1969), *cert. denied,* 400 U.S. 869, 91 S.Ct. 103, 27 L.Ed.2d 109 (1970); *FS Services, Inc. v. United States,* 413 F.2d 548, 188 Ct.Cl. 874 (1969); *Booth Newspapers, Inc. v. United States,* 303 F.2d 916, 157 Ct.Cl. 886 (1962), should apply to *Agway.*

If, as the majority states, by applying the *Corn Products* doctrine "we would be effectively holding that cooperatives and their patrons could not hold capital stock as a capital asset," then so be it. If the type of stock is in nature a temporary capital advance, then, ipso facto, there is no investment intent in holding that stock since it is known and intended that it will be redeemed within a short period of time.

For the above reasons, I would allow defendant's motion for summary judgment, deny plaintiff's motion for summary judgment, and dismiss plaintiff's petition.