*An appropriate order will be issued.*

GOLD KIST INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10768–93.          Filed June 26, 1995.

*B. Harvey Hill, Jr., Pinney L. Allen, Timothy J. Peaden,* and *Ben E. Muraskin,* for petitioner.
*Larry D. Anderson,* for respondent.

WELLS, *Judge:* Respondent determined the following deficiencies in petitioner's Federal income taxes:

| TYE | Deficiency |
| --- | --- |
| June 30, 1987 | $1,107,667 |
| June 30, 1988 | 1,150,964 |
| June 30, 1989 | 840,866 |

Unless otherwise indicated, all subchapter and section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions,[1] the issues for decision are (1) whether the tax benefit rule requires petitioner to recognize income upon the redemption of "qualified written notices of allocation" at less than their stated amounts because petitioner had claimed deductions during earlier taxable years equal to the stated amounts of such notices of allocation when they were issued, and (2) whether section 311(a) applies to the redemption of the qualified written notices of allocation.

---

[1] Respondent concedes that petitioner is entitled to dividends received deductions in the amounts of $1,266,547, $1,843,998, and $19,387 for dividends received from GKX, Inc., for its taxable years ended June 30, 1987, 1988, and 1989, respectively. The parties agree that petitioner is entitled to dividends received deductions in the amounts of $135,300 and $135,300 for dividends received from Golden Poultry Co., Inc., for its taxable years ended June 30, 1988 and 1989, respectively. The parties also agree that petitioner is entitled to dividends received deductions in the amounts of $62,250 and $57,193 for dividends received from Archer Daniels Midland, Inc., for its taxable years ended June 30, 1988 and 1989, respectively.

## FINDINGS OF FACT

Some of the facts and certain exhibits have been stipulated for trial pursuant to Rule 91. The parties' stipulation is incorporated in this opinion by reference. At the time the petition in the instant case was filed, petitioner's principal place of business was located in Atlanta, Georgia. Petitioner keeps its books and records and files its Federal income tax return using a fiscal year ending June 30.

Petitioner is a regional marketing and supply cooperative which is organized as a Georgia corporation and operated under the Georgia Cooperative Marketing Act. For Federal tax purposes, petitioner is currently a taxable or nonexempt farmers cooperative as defined in section 1381(a)(2).

### Background

Originally, petitioner was formed during 1933 by D.W. Brooks as a Delaware corporation operating as an exempt Georgia farmers cooperative. Mr. Brooks had formed petitioner to help Georgia farmers who were having difficulty marketing their cotton during the Great Depression. At that time, petitioner operated under the name Georgia Cotton Cooperative Association and focused on providing quality farm supplies to Georgia farmers on a competitive basis. During years in which petitioner earned a surplus, petitioner would distribute refunds to its patrons. During 1936, Georgia Cotton Cooperative Association was liquidated and a new corporation, Georgia Cotton Producers Association, was formed under the Georgia Cooperative Marketing Act, as the successor to Georgia Cotton Cooperative Association. During September 1937, the Commissioner issued a private letter ruling which stated that Georgia Cotton Producers Association was an "exempt" farmers cooperative under section 101(12) of the Revenue Act of 1936, the predecessor of section 521. During 1970, the name of Georgia Cotton Producers Association was changed to petitioner's current name, Gold Kist Inc.

Over the years, petitioner expanded its activities beyond the marketing of cotton. Petitioner acquired a small fertilizer plant in order to produce fertilizer of a higher quality than it was able to procure in the marketplace. Petitioner also began supplying local cooperatives in the Southeast with

such items as farm supplies, fertilizer, feed, and seed. During the 1940's, petitioner entered the poultry field. By 1957, petitioner had built feed mills and was processing approximately 250,000 chickens per week.[2] Meanwhile, petitioner also acquired three soybean crushing plants as well as pecan and peanut shelling facilities. Petitioner also developed substantial grain elevators.

By 1977, petitioner was a large cooperative which served its many member and nonmember patrons as a multimillion-dollar agribusiness corporation. Petitioner's size and its involvement in many aspects of agribusiness prevented petitioner from maintaining its status as an exempt cooperative. On June 30, 1977, petitioner began operating as a taxable cooperative under subchapter T for Federal income tax purposes.

During the taxable years in issue, petitioner's operations involved the following five areas: (1) The sale of retail and wholesale farm supplies to members and nonmembers; (2) the sale to members of animals and related supplies, the repurchase of eggs and grown animals from members, and the processing of such items for market and sale to members and nonmembers; (3) the purchase of grain from members and nonmembers, the processing of the grain into oil, meal, and other products, and the sale of such items to members and nonmembers; (4) the purchase of nuts from members and nonmembers, the processing of the nuts for sale to members and nonmembers, and pecan farm management services for members on a fee basis; and (5) the production and sale of seed to members and nonmembers.[3]

## Membership and Stock

Petitioner is owned and controlled by its members. To be eligible for membership, a person, firm, or corporation must (1) be engaged in the production of farm commodities and (2) sign a marketing and/or purchasing agreement. Petitioner's members are entitled to vote on all matters and to receive patronage dividends (described below) based on each member's respective patronage with petitioner. Each of petitioner's members has consented under section 1385(a) to take

[2] Currently, petitioner processes approximately 12 million chickens per week.

[3] For clarity, we note that all dealings with members and nonmembers were similar except that nonmembers did not receive patronage dividends.

into gross income the stated dollar amount of any qualified written notices of allocation (described below) paid as patronage dividends. Additionally, all members are entitled to a share of petitioner's net equity upon petitioner's liquidation.

Prior to 1985, petitioner did not issue any common stock to its members. As of April 25, 1985, petitioner began issuing one share of common stock to each member to evidence membership and each member's property right in petitioner.[4] Petitioner issues no other common stock. No member may own more than one share of common stock, and upon termination of membership, petitioner is obligated to repurchase such common stock. Although petitioner is authorized to issue preferred stock, petitioner has not issued any preferred stock to date.

*Patronage Dividends*

Petitioner's members conduct business with petitioner by buying farm supplies from petitioner or selling farm products to petitioner at competitive prices. According to the bylaws, the term "patronage" refers to any and every transaction between Gold Kist Inc. and a person who, at the time of the transaction, is a member, except such transactions as are conducted pursuant to agreements providing for the contrary; the term "patronage earnings" refers to earnings from patronage business done with or for patrons; and the term "patron" refers to each member or former member, but only to the extent said member or former member participates or has participated in patronage transactions.

Pursuant to its bylaws, petitioner annually determines its net patronage earnings and distributes such patronage earnings to its members on the basis of their respective patronage with petitioner.[5] The term "patronage dividend" refers to any distribution made to a member from patronage earnings. Petitioner distributes patronage dividends within 8½ months

---

[4] Such common stock is issued by debiting the member's account for qualified or nonqualified written notices of allocation for $1. Stock of a member without any qualified or nonqualified written notices of allocation is held in escrow until the member becomes entitled to patronage dividends, at which time the debiting occurs and a certificate is issued.

[5] For fiscal years beginning prior to July 1, 1977, while petitioner was operating as an exempt cooperative, petitioner annually determined its net earnings from business done with or for all of its patrons; i.e., members and nonmembers, and allocated such earnings to all patrons on a patronage basis according to its bylaws. For such years, petitioner issued patronage dividends to both member and nonmember patrons. Since petitioner became a taxable cooperative, however, it has only issued patronage dividends to members.

of the close of the fiscal year in which such dividends are earned.

The board of directors determines the form of the patronage dividend and allocates all or part of each patronage dividend as a "qualified written notice of allocation" or a "nonqualified written notice of allocation" within the meaning of subchapter T.[6] The term "qualified written notice of allocation" refers to the written notices of allocation that were deductible from petitioner's income as provided in subchapter T for years during which at least 20 percent of such allocated earnings were distributed to members in cash. The term "nonqualified written notice of allocation" refers to the written notices of allocation that were not deductible from petitioner's income for taxable years during which less than 20 percent of such allocated earnings was distributed to members in cash.

For its fiscal year 1971, petitioner's allocations of its patronage earnings were made in qualified checks, as defined in section 1388(c)(4), and revolving fund certificates. For fiscal years 1972 through 1977, petitioner's allocations of its net earnings were made in revolving fund certificates and written notices of allocated reserves. Beginning in fiscal year 1978, petitioner allocated its net earnings in qualified checks and written notices of allocated reserves.

## Redemptions

At the discretion of its board of directors, petitioner redeems or "revolves" its notified equity for cash starting with the qualified written notices of allocation that have been outstanding for the longest period of time. Petitioner revolves the notified equity over varying periods of years in order to provide adequate equity capital for its operations and expansion. For example, during 1986, petitioner revolved to its members notified equity which had been allocated to them in 1966. When petitioner revolves qualified written notices of allocation, petitioner pays the stated amounts of the notices to each respective member. Petitioner also

---

[6] All outstanding qualified and nonqualified written notices of allocations collectively make up petitioner's "allocated reserves".

The allocated reserves are referred to as "patronage reserves" on petitioner's financial statements and "notified equity" in communications between petitioner and its members. We use such terms interchangeably.

redeems a member's outstanding qualified written notices of allocation at the stated amounts in the event of a member's death.

Additionally, petitioner's policy is to redeem a member's notified equity if the member terminates membership and demands payment of the member's notified equity. Such a circumstance is referred to as an "early redemption".[7] In an early redemption, petitioner pays cash for the qualified written notices of allocation held by the terminating member at discounted values rather than at the stated amounts.[8] Petitioner determines the present value of a terminating member's equity by discounting the stated amounts of the qualified written notices of allocation to present worth using an "estimated redemption date". The "estimated redemption date" is based on petitioner's practice in revolving its notified equity.[9] The board of directors discounts the qualified written notices of allocation on early redemption at the same per annum interest rate as it is offering on its 15-year capital certificates of interest[10] on the date that petitioner receives the request for early redemption from a terminating member. In calculating the present value of a terminating member's qualified written notices of allocation, petitioner also takes into account its policy of paying the stated amount of qualified written notices of allocation upon the death of a member. Consequently, petitioner uses a standard mortality table to determine whether a member is expected, on an actuarial basis, to live until the estimated redemption. Petitioner then uses the shorter of the two periods as the basis for determining the present value of a member's qualified written notices of allocation.

---

[7] A former member who has been redeemed in an early redemption can only become a member again with the approval of the management executive committee of petitioner. Since the adoption of the policy, petitioner's management executive committee has permitted only one former member to rejoin.

[8] Additionally, certain nonmember patrons, who received patronage dividends prior to petitioner's fiscal year 1978 when petitioner was an exempt cooperative, demanded payment of their outstanding qualified written notices of allocation and were treated in the same manner as resigning members.

[9] For example, if at the time of the early redemption, petitioner had been revolving notified equity from 22 years prior to the redemption year, then the estimated redemption date would be 22 years later. The number of years between the early redemption date and the estimated redemption date changes over time depending on when petitioner revolves its notified equity.

[10] If no 15-year capital certificates of interest are being offered at such time, the board of directors will determine another fair rate taking into consideration the rates of interest being paid by petitioner at such time.

In an early redemption of qualified written notices of allocation, petitioner does not take into account as income for financial accounting purposes the difference between the stated amounts of qualified written notices of allocation redeemed and the discounted values; i.e., the actual amount paid in cash to members or nonmembers. Petitioner merely reduces its patronage reserves account on its financial statements by the stated amounts of qualified written notices of allocation redeemed and decreases its cash account by the amounts paid. The differences between the stated amounts of the qualified written notices of allocation and the amounts paid to redeem the qualified written notices of allocation are recorded as additions to petitioner's "retained earnings",[11] an equity account on petitioner's financial statements. The net reduction in equity of petitioner is equal to the amount of cash paid by petitioner to redeem the qualified written notices of allocation.

*Petitioner's Taxable Years 1987, 1988, and 1989*

Petitioner had the following number of members as of the identified dates:

| | |
|---|---|
| June 30, 1987 | 155,025 |
| June 30, 1988 | 128,990 |
| June 30, 1989 | 118,043 |

During taxable years ended 1987 through 1989, qualified written notices of allocation and the nonqualified written notices of allocation were redeemed from 252 holders, 216 holders, and 178 holders, respectively.[12]

For the taxable years in issue, petitioner redeemed qualified written notices of allocation as follows:

| TYE | Stated value [1] | Discounted value | Difference between stated and discounted values |
|---|---|---|---|
| 6/30/87 | $2,142,426 | $1,001,002 | $1,141,424 |
| 6/30/88 | 2,419,634 | 1,064,083 | 1,355,551 |

---

[11] "Retained earnings" principally includes the net earnings of petitioner's subsidiaries and noncooperative business ventures. It also includes net earnings from nonpatronage and nonmember business transactions.

[12] The tax consequences of the redemption of the nonqualified notices are not in issue.

| | | | |
|---|---|---|---|
| 6/30/89 | 3,136,779 | 943,743 | 2,193,036 |

[1] Such amounts represented approximately 1.39 percent, 1.52 percent, and 1.66 percent, respectively, of total patronage reserves outstanding as of the end of each fiscal year.

Petitioner did not include in its income for Federal income tax purposes the amounts by which the stated values of the qualified written notices of allocation exceeded the discounted values paid in early redemption of such notices. Respondent determined that petitioner's taxable income should be increased to include such excess amounts during the taxable years in issue. Respondent determined that the tax benefit rule requires the inclusion of such excess amounts as nonpatronage income in the year of early redemption.

## OPINION

The first issue we must decide is whether the tax benefit rule requires petitioner to recognize income upon the redemption of qualified written notices of allocation at less than their stated amounts because petitioner had claimed deductions during earlier taxable years equal to the stated amounts of such notices of allocation when they were issued.

A complete overview of the regime under which nonexempt cooperatives are taxed is set forth in *Buckeye Countrymark, Inc. v. Commissioner,* 103 T.C. 547, 554–555 (1994). Consequently, we will discuss only those cooperative concepts which are unique to the consideration of the issue involved in the instant case.

Section 1382(a) requires cooperatives to initially determine gross income without making any adjustments for any allocations or distributions made to patrons from net earnings from business with or for patrons.[13] To calculate taxable income, section 1382(b) mandates that cooperatives "shall not

---

[13] Sec. 1382(a) provides:

SEC. 1382(a). GROSS INCOME.—Except as provided in subsection (b), the gross income of any organization to which this part applies shall be determined without any adjustment (as a reduction in gross receipts, an increase in cost of goods sold, or otherwise) by reason of any allocation or distribution to a patron out of the net earnings of such organization or by reason of any amount paid to a patron as a per-unit retain allocation (as defined in section 1388(f)).

[take] into account" qualified patronage dividends and qualified per-unit retain allocations,[14] as well as amounts paid in redemption on distributions previously designated as nonqualified written notices of allocation or nonqualified per-unit retain certificates.[15] The flush language in section 1382(b) provides that "any amount not taken into account" with respect to patronage dividends (and amounts paid in redemption of nonqualified written notices of allocation) shall be treated in the same manner as an item of gross income followed by a deduction. The other special deductions provided by subchapter T are available only to farmers cooperatives described in section 521 and are not available to nonexempt cooperatives such as petitioner. Sec. 1382(c).

In general, a patronage dividend is an amount that is (1) allocated or paid to a patron out of the net earnings of the cooperative from business done with or for its patrons and (2) based upon the quantity or value of business done with or for the patron, under a preexisting obligation to pay such amount. Sec. 1388(a). For a cooperative to be entitled to deduct patronage dividends under section 1382(b)(1), the patronage dividends must be distributed during the payment period [16] and must be paid with respect to patronage during

---

[14] A per-unit retain allocation is an amount allocated or paid to a patron with respect to products marketed for the patron that is fixed without regard to the net earnings of the cooperative. Sec. 1388(f).

[15] Sec. 1382(b) provides as follows:

SEC. 1382(b). PATRONAGE DIVIDENDS AND PER-UNIT RETAIN ALLOCATIONS.—In determining the taxable income of an organization to which this part applies, there shall not be taken into account amounts paid during the payment period for the taxable year—

(1) as patronage dividends (as defined in section 1388(a)), to the extent paid in money, qualified written notices of allocation (as defined in section 1388(c)), or other property (except nonqualified written notices of allocation (as defined in section 1388(d))) with respect to patronage occurring during such taxable year;

(2) in money or other property (except written notices of allocation) in redemption of a nonqualified written notice of allocation which was paid as a patronage dividend during the payment period for the taxable year during which the patronage occurred;

(3) as per-unit retain allocations (as defined in section 1388(f)), to the extent paid in money, qualified per-unit retain certificates (as defined in section 1388(h)), or other property (except nonqualified per-unit retain certificates, as defined in section 1388(i)) with respect to marketing occurring during such taxable year; or

(4) in money or other property (except per-unit retain certificates) in redemption of a nonqualified per-unit retain certificate which was paid as a per-unit retain allocation during the payment period for the taxable year during which the marketing occurred.

For purposes of this title, any amount not taken into account under the preceding sentence shall, in the case of an amount described in paragraph (1) or (2), be treated in the same manner as an item of gross income and as a deduction therefrom, and in the case of an amount described in paragraph (3) or (4), be treated as a deduction in arriving at gross income.

[16] The payment period is the taxable year plus 9½ months following the close of the taxable

such taxable year. Sec. 1382(b), (d). Payment may be made in money, "qualified written notices of allocation" (defined below), or other property (except for nonqualified written notices of allocation). The amount of the deduction is the stated dollar amount of the qualified written notice of allocation or the fair market value of property other than written notices of allocation. Sec. 1.1382–2(b)(1), Income Tax Regs. A "written notice of allocation" can be a share of capital stock, retain certificate, certificate of indebtedness, or other written notice that informs the recipient that a stated dollar amount has been allocated for his or her benefit and indicates the amount of the allocation that is a patronage dividend. Sec. 1388(b). A written notice of allocation is considered "qualified" (1) if the notice is redeemable at its stated dollar amount in cash at any time within 90 days of the date of payment, and the patron is notified of the right of redemption when the notice is distributed, or (2) if the patron consents to take the notice into account currently at its stated dollar amount under section 1385(a),[17] usually by reporting the amount in gross income.[18] Sec. 1388(c). In either case, a

---

year. Sec. 1382(d).

[17] Sec. 1385(a) provides that

SEC. 1385(a). GENERAL RULE.—Except as otherwise provided in subsection (b), each person shall include in gross income—

(1) the amount of any patronage dividend which is paid in money, a qualified written notice of allocation, or other property (except a nonqualified written notice of allocation), and which is received by him during the taxable year from an organization described in section 1381(a),

[18] The term "qualified written notice of allocation" is defined in sec. 1388(c) as follows:

SEC. 1388(c). QUALIFIED WRITTEN NOTICE OF ALLOCATION.—

(1) DEFINED.—For purposes of this Subchapter, the term "qualified written notice of allocation" means—

       *       *       *       *       *       *       *

(B) a written notice of allocation which the distributee has consented, in the manner provided in paragraph (2), to take into account at its stated dollar amount as provided in section 1385(a).

Such term does not include any written notice of allocation which is paid as part of a patronage dividend or as part of a payment described in section 1382(c)(2)(A), unless 20 percent or more of the amount of such patronage dividend, or such payment, is paid in money or by qualified check.

(2) MANNER OF OBTAINING CONSENT.—A distributee shall consent to take a written notice of allocation into account as provided in paragraph (1)(B) only by—

(A) making such consent in writing,

(B) obtaining or retaining membership in the organization after—

(i) such organization has adopted (after October 16, 1962) a bylaw providing that membership in the organization constitutes such consent, and

(ii) he has received a written notification and copy of such bylaw, or

(C) if neither subparagraph (A) nor (B) applies, endorsing and cashing a qualified check, paid as part of the patronage dividend or payment of which such written notice of allocation is also a part, on or before the 90th day after the close of the payment period for the taxable

written notice of allocation is not considered to be qualified unless at least 20 percent of the patronage dividend is paid in money or a "qualified check". The term "qualified check" means a check (or other instrument redeemable in money) which is paid as a part of a patronage dividend to a patron who has not consented to take the distribution into income, on which there is imprinted a statement that the endorsement or cashing of the instrument constitutes consent of the payee to include in his or her gross income the stated dollar amounts of any written notices of allocation that are paid as a part of the patronage dividend. Sec. 1388(c)(4).

The patron consents to take the qualified written notices of allocation into income in one of three ways: (1) By agreement in writing; (2) by becoming a member or retaining membership in the cooperative after the cooperative adopts a bylaw providing that membership is deemed to be consent, so long as the member receives written notification of the enactment of the bylaw and a copy of the bylaw; or (3) by the endorsement and cashing of a qualified check distributed with the qualified written notice of allocation within 90 days after the end of the payment period for the cooperative's taxable year. Sec. 1388(c)(2).

Under the foregoing regime, taxable or nonexempt cooperatives are treated as hybrids for Federal tax purposes. With respect to business done with or for patrons, cooperatives are treated somewhat like pass-through entities; i.e., partnerships or S corporations. *Farm Serv. Co-op. v. Commissioner,* 619 F.2d 718, 723 (8th Cir. 1980), revg. 70 T.C. 145 (1978).[19] Specifically, the distribution of patronage earnings in money, qualified written notices of allocation, or other property by a cooperative is taxable to the patrons and not to the cooperative. The theory behind not taxing a cooperative with respect to patronage income is that the cooperative is merely a conduit through which each member realizes such member's proportionate share of the cooperative's earnings and incurs a corresponding share of the cooperative's expenses. See Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, par. 104.1, at 104–1 (2d ed. 1992).

___

year of the organization for which such patronage dividend or payment is paid.

[19] See Benson, "Drafting a Liquidation Provision for a Cooperative Association", 21 Taxn. for Law. 316 (March/April 1993).

Although a nonexempt cooperative is not permitted to take deductions (and is thereby taxed) in the year of distribution with respect to nonqualified patronage dividends and non-qualified per-unit allocations, the cooperative is entitled to deductions when the nonqualified items are redeemed. Sec. 1382(b)(2), (4). Consequently, the cooperative is ultimately treated as a conduit with respect to such nonqualified items.

Nonexempt cooperatives, however, are taxed like ordinary C corporations on business not conducted with patrons (i.e., nonpatronage business). Consequently, income from nonpatronage business is taxed to the cooperative, and, if the balance is distributed to patrons, the income is taxed again to the patrons. *Farm Serv. Co-op. v. Commissioner, supra* at 723.

Turning to the parties' arguments, respondent contends that the tax benefit rule requires petitioner to include in its income the amounts by which the stated amounts exceed the discounted values of redeemed qualified written notices of allocation. That is, respondent contends that petitioner is not entitled to deductions for portions of qualified written notices of allocation that it never will pay to patrons. Specifically, respondent contends that a cooperative's redemption of quali-fied written notices of allocation for less than their stated amounts is fundamentally inconsistent with the cooperative's prior deduction of the stated amounts of such notices. Respondent also contends that the application of the tax benefit rule to such a circumstance harmonizes with the overall treatment of cooperatives and their patrons with respect to the issuance and payment of qualified written notices of allocation.[20]

---

[20] Regarding this argument, respondent repeatedly refers to Rev. Rul. 70–64, 1970–1 C.B. 36, and Rev. Rul. 70–407, 1970–2 C.B. 52, under which patrons who receive less than the stated amount of notified equity on redemption are entitled to take ordinary loss deductions for the amounts retained by the cooperative. Petitioner correctly points out that the Commissioner ex-plicitly suspended Rev. Rul. 70–64 and effectively suspended Rev. Rul. 70–407 in Notice 87–68, 1987–2 C.B. 378, pending the Supreme Court's decision in the appeal of *Arkansas Best Corp. v. Commissioner*, 800 F.2d 215 (8th Cir. 1986), affd. 485 U.S. 212 (1988). The revenue rulings had been based on the holding of *Corn Prods. Ref. Co. v. Commissioner*, 350 U.S. 46 (1955), which the rulings construed as permitting ordinary loss treatment for certain business-moti-vated transactions in stock and other capital assets. The issue of the character of a loss taken by a patron with respect to a notified equity redemption at less than face value has yet to be addressed by this Court. As the issue of the character of the patron's deduction is not before us, we do not address the issue. Because that issue is undecided, however, we reject respond-ent's argument regarding the inclusion of income based on any matching principle; i.e., respond-ent's contention that because patrons are allowed to take deductions for the losses, petitioner must take the difference into income.

Petitioner contends that qualified written notices of allocation constitute equity under traditional principles of debt/equity and that, under section 311, Generally Accepted Accounting Principles (GAAP), case law, or subchapter T and its legislative history, the redemption of equity does not result in income. In reply, respondent contends that, even if section 311 applies to prevent the inclusion of income in the instant case, the tax benefit rule overrides such provision. Finally, petitioner argues that the tax benefit rule does not apply to the redemption of notified equity at less than the stated amount based on the Supreme Court's decision in *Hillsboro Natl. Bank v. Commissioner,* 460 U.S. 370 (1983), and its progeny.

The tax benefit rule is a judicially created principle (partially codified in section 111) which serves to remedy certain disparities inherent in the use of an annual accounting system for the reporting of Federal income taxes. *Hillsboro Natl. Bank v. Commissioner* and *United States v. Bliss Dairy, Inc.,* 460 U.S. 370, 377 (1983) (hereafter *Bliss Dairy*).

The tax benefit rule rectifies the inequity that results when a deduction is taken during one taxable year and subsequent events indicate that the deduction would not have been taken if all of the relevant facts had been known at the time of the deduction. *Id.* at 383–384. The classic example of the application of the tax benefit rule is the collection of a debt which had been deducted in an earlier tax year pursuant to section 166(a) as a bad debt. *Id.* at 377. The "inclusionary" component of the tax benefit rule requires the taxpayer to recognize the repayment of the debt as income in the year of the recovery. Absent the tax benefit rule, the repayment would be a nontaxable return of capital and the Government might be foreclosed from recouping the tax attributable to the prior deduction. The "exclusionary" component of the tax benefit rule limits the amount the taxpayer must include in the year of the recovery to the amount of the tax benefit received from the deduction in the prior year. See sec. 111(a);[21] *Rojas v. Commissioner,* 90 T.C. 1090, 1097 (1988), affd. 901 F.2d 810 (9th Cir. 1990).

---

[21] Although sec. 111, by its express terms, applies only to bad debts, taxes, and delinquency amounts, it is well settled that sec. 111 does not limit the application of the exclusionary aspect of the tax benefit rule. *Hillsboro Natl. Bank v. Commissioner* and *United States v. Bliss Dairy,*

Originally, the application of the tax benefit rule was limited to the actual recovery of the amount previously deducted. See, e.g., *Nash v. United States,* 398 U.S. 1 (1970). In *Bliss Dairy,* however, the Supreme Court expanded the rule by stating that "a 'recovery' will not always be necessary to invoke the tax benefit rule." 460 U.S. at 381. Instead, the tax benefit rule is to be applied when it appears that a later unforeseen event is "fundamentally inconsistent with the premise on which the deduction was initially based", in the sense that the deduction would have been foreclosed if the unforeseen event had occurred in the same taxable year. *Id.* at 383–384.

The Supreme Court, however, made it clear that not every unforeseen event will require the application of the tax benefit rule. *Id.* at 383. The Court stated that, in some instances, the only event that would be fundamentally inconsistent (and consequently trigger the tax benefit rule) would be a subsequent recovery by the taxpayer. The Court provided the example of a calendar year taxpayer who makes a rental payment on December 15 for a 30-day lease which is deductible during the current year under section 162(a)(3). The Court explained that, if the leased premises were destroyed by fire on January 10, the tax benefit rule would not require the recognition of income because the taxpayer's inability to occupy the building would not be fundamentally inconsistent with the prior ordinary and necessary business deduction. If, on the other hand, the premises had not burned, but in January, the taxpayer decided to use the premises as his residence, the taxpayer would have converted the business use of the premises to personal use. The Court stated that the taxpayer's change in use of the premises would be an event which is fundamentally inconsistent with the business use on which the deduction in the prior year was premised. Consequently, under the tax benefit rule, the taxpayer would recognize income on account of the portion of the deduction that was erroneously taken. Returning to the first scenario in which the premises were destroyed by fire, the Court stated that, if the lessor had refunded the rental payment, the tax benefit rule would apply because the subsequent recovery of the previously deducted rental payment would be

---

*Inc.,* 460 U.S. 370, 388 (1983).

fundamentally inconsistent with the use on which the deduction was premised. *Id.* at 384–385.

The Court concluded that the tax benefit rule must be applied on a "case-by-case basis", mandating that lower courts consider "the facts and circumstances of each case in the light of the purpose and function of the provisions granting the deductions." *Id.* at 385.

In *Bliss Dairy,* the Supreme Court also specifically addressed the situation in which the subsequent event occurs in the context of a nonrecognition provision of the Code. The Court recognized that an "inherent tension" exists between the tax benefit rule and nonrecognition provisions. Again, the Court refused to formulate a blanket rule that the tax benefit rule must prevail, but instead stated that the analysis should focus on the specific provisions in issue before the Court. *Id.* at 385–386.

One of the two consolidated cases presented to the Supreme Court in *Bliss Dairy* dealt with a dairy corporation which deducted, under section 162(a), certain cattlefeed used in its business. After the end of the fiscal year in which the dairy corporation deducted the cattlefeed, it adopted a plan of liquidation under sections 333 and 336 and distributed to its shareholders all of its assets, including the cattlefeed on hand. After the liquidation, the former shareholders continued to run the dairy enterprise in noncorporate form. The Supreme Court examined the purpose and function of the deduction under section 162(a) and stated that the deduction is "predicated on the consumption of the asset in the trade or business. See Treas. Reg. § 1.162–3, 26 CFR § 1.162–3 (1982)." *Id.* at 395. The Court concluded that the distribution of grain to the shareholders was a nonbusiness use of the grain, analogous to personal consumption, which is explicitly nondeductible under section 262. The Court held that the liquidation was fundamentally inconsistent with the earlier deduction of the cost of the grain because the liquidation converted the business use of the grain to a nonbusiness use and, consequently, frustrated consumption of the grain in the business, the premise on which the deduction was allowed. *Id.* at 395–396.

In *Rojas v. Commissioner,* 90 T.C. 1090 (1983), we had the opportunity to analyze the tax benefit rule as it related to a corporation that adopted a plan of complete liquidation and,

pursuant to such plan, distributed to its majority shareholders all of its operating assets including harvested and unharvested crops. Prior to the liquidation, the taxpayer corporation had deducted the costs of cultivating the crops under section 162 as ordinary and necessary business expenses. The issue in *Rojas* was whether the tax benefit rule required the taxpayer to restore to income the cost of the crops.

The taxpayer argued that the costs expended were for materials and services that were used and consumed in the ordinary course of the corporation's farming business prior to liquidation and that no such materials and services were on hand at the time of the liquidation or distributed to shareholders. The taxpayer argued that the materials and services were similar to the cattlefeed that had been consumed by the dairy cows in *Bliss Dairy* and that the fundamental inconsistency on which the Court's decision was based was not present in *Rojas* because the assets were consumed in the business and not converted to a nonbusiness use. The Commissioner argued that deductions under section 162 are predicated on the sale of the product produced from such expenses and the production of income.

After reviewing the purpose and function of section 162 as set forth in the regulations and as analyzed by the Supreme Court in *Bliss Dairy,* we concluded that "there is nothing, either explicit or by necessary implication, in this provision [section 162] to suggest that the deduction of crop expenses is predicated on the eventual sale of the crop." *Rojas v. Commissioner, supra* at 1103. Accordingly, in *Rojas* we held that the tax benefit rule did not require the taxpayer to include the cost of materials and supplies consumed in the farm business. Unlike *Bliss Dairy,* in *Rojas,* there was no change in the use of the assets on which the deductions were premised and, therefore, no fundamentally inconsistent event.

With these cases in mind, we must examine whether petitioner's redemption of the qualified written notices of allocation at less than their stated amounts is "fundamentally inconsistent" with petitioner's deduction of the stated amounts in the taxable year of issuance. Pursuant to *Bliss Dairy,* we must decide whether the deduction would have been foreclosed had petitioner redeemed the qualified written

notices of allocation at less than their stated amounts during the same taxable year as the issuance of the notices. 460 U.S. at 384. In so doing, we must look to the purpose and function of the prior year's deduction. *Rojas v. Commissioner, supra* at 1098 (citing *Bliss Dairy,* 460 U.S. at 395). If we decide that the deduction was fundamentally inconsistent with the redemption of the notices at less than their stated amounts, then we must analyze whether any nonrecognition provision prevails over the tax benefit rule. See *Bliss Dairy,* 460 U.S. at 390–391.

Respondent contends that petitioner's deduction is fundamentally inconsistent with the redemption, arguing that, if the redemption had occurred during the same taxable year as the issuance, petitioner would be entitled only to a deduction equal to the discounted value; i.e., the amount actually paid. Respondent contends that Congress' intent in enacting subchapter T was to tax patronage dividends either at the cooperative level or at the patron level, and implicit in such scheme is the premise that the cooperative will only deduct amounts that it will actually pay out to its patrons. In contrast, petitioner contends that the legislative history of subchapter T indicates that Congress viewed the payment of patronage dividends via the issuance of qualified written notices of allocation as involving two separate and distinct transactions, the first transaction being the payment of a patronage dividend and the second transaction being the reinvestment of the dividend by the patron in an equity instrument of the cooperative. Petitioner further contends that the redemption of a qualified written notice of allocation is related to the second transaction, the reinvestment of the dividend by the patron, which is unrelated to the first transaction, the distribution of the qualified written notice of allocation which triggers the deduction. Consequently, petitioner argues that, because the deduction taken for distribution of the patronage dividend at the stated amount is unrelated to the redemption at a discounted value, the deduction of the stated amount cannot be fundamentally inconsistent with the redemption at a discounted value. Petitioner also contends that, in any event, because petitioner pays its patronage dividends during the calendar year following the end of its fiscal or taxable year, petitioner could not redeem the qualified written notices of allocation during the same

taxable year in which it took the deduction under section 1382(b). Petitioner therefore concludes that the *Bliss Dairy* test is inapplicable.

We agree with respondent that the tax benefit rule applies to the transaction in issue. The legislative history of subchapter T reveals that Congress intended patronage dividends to be taxed at either the cooperative level *or* at the patron level. S. Rept. 1881, 87th Cong., 2d Sess. 111 (1962). Accordingly, the purpose of the deduction for patronage dividends, to the extent the dividends are paid in money, qualified written notices of allocation, or property (except nonqualified written notices of allocation) under section 1382(b), is to comport with the "one level scheme" of taxation by relieving the cooperative from paying tax where the patrons are required to take the dividends into income. The deduction is wholly dependent on the status of the income as a qualified patronage dividend that has been currently taxed at the patron level. Petitioner records the stated amounts of qualified written notices of allocation on its books as part of its patronage reserves account; i.e., the account for funds linked to specific patrons. At trial, Walter F. Pohl, petitioner's comptroller, testified that when petitioner redeems notified equity at less than its stated amount

the face amount of the equity is removed from the patronage reserves. And, of course, you know, there is the amount of cash that is paid out. And the difference between the two is reclassified from patronage reserves into non-notified equity, which is a part of retained earnings.

Petitioner argues that, as there is no movement of funds and the transaction is merely a bookkeeping entry on petitioner's part, it is an insignificant event for Federal tax purposes. We disagree.

Although for accounting purposes the redemption of notified equity may not trigger the recognition of income because the funds are merely shifted from one equity account to another, a significant event occurs for Federal tax purposes. The difference between the stated amount and the discounted value paid on redemption (i.e., the amount retained by petitioner) no longer meets the definition of a patronage dividend under section 1388(a) because the difference is no longer an amount that is being paid to a patron on the basis of the quantity or value of the business done with such

patron, especially if viewed in the same taxable year in which petitioner claimed a deduction under section 1382(b). The facts of the instant case describe a situation very similar to one of the examples given by the Supreme Court in *Bliss Dairy* discussed *supra* p. 711. *Bliss Dairy,* 460 U.S. at 383. Like the taxpayer who has taken a business deduction for payments made to lease premises for his trade or business and subsequently decides to use the premises as his residence (a nondeductible personal use), petitioner has taken a deduction for patronage dividends that petitioner later does not pay out as patronage dividends. In the example, no movement of funds takes place; the only event is the change in use by the taxpayer. Similarly, in the instant case, the deductible patronage dividends, in effect, have been converted into nondeductible nonpatronage funds. As Congress only provided for deductions for patronage dividends, we hold that the redemption of qualified written notices of allocation at less than their stated amounts is fundamentally inconsistent with the deduction of notices at their stated amounts and that the difference represents an amount which no longer qualifies as a patronage dividend.

Petitioner is correct that the legislative history also indicates that patrons are deemed to have constructively received the dividends and subsequently to have voluntarily reinvested the amount taken into income. We, however, believe that such statement merely serves as justification for taxing the patrons prior to receipt and does not necessarily dictate that the redemption of the qualified written notices of allocation is no longer connected to the original allocation of patronage dividends for which a deduction was taken. Petitioner's argument that the *Bliss Dairy* test is inapplicable because petitioner pays out its patronage dividends during the calendar year following the end of the fiscal year is also without merit. Whether an issuance and redemption of a qualified written notice of allocation is likely to occur as a practical matter during the same taxable year is not relevant to the application of the tax benefit rule. Instead, the Supreme Court directs us to analyze what would happen if petitioner issued and redeemed the notice during petitioner's taxable year. *Bliss Dairy,* 460 U.S. at 384. We note that it is possible for a cooperative to redeem its written notices during the same taxable year as the issuance. We have consid-

ered petitioner's remaining arguments on this issue and find them to be without merit.[22]

Turning to the next issue, petitioner contends that, even if the deduction is fundamentally inconsistent with redemption at less than the stated amount of the notice, section 311(a) applies to the redemption of the qualified written notices of allocation and overrides the application of the tax benefit rule. Petitioner contends that section 311(a) applies to the redemption of the qualified written notices of allocation because the instruments are equity. Respondent contends that section 311(a) is inapplicable because petitioner's redemption of the notices is not "with respect to stock".[23] Additionally, respondent contends that section 311 does not apply to petitioner because petitioner and its patrons are engaged in a vendor-vendee relationship which is excluded from section 311 under section 1.311–1(e)(1), Income Tax Regs. Finally, respondent argues that section 311(a) does not override the tax benefit rule.

Section 311(a) provides that, except as provided in subsection (b),[24] no gain or loss shall be recognized to a corporation on the distribution (not in complete liquidation) with respect to its stock of (1) its stock (or rights to acquire stock) or (2) property. All of petitioner's cash distributions in issue were made with respect to the redemption of qualified written notices of allocation.[25] Consequently, unless qualified written notices of allocation are considered "stock", section 311 does not apply to petitioner's redemption.

---

[22] For instance, petitioner cites *Agway, Inc. v. United States,* 207 Ct. Cl. 682, 524 F.2d 1194 (1975) and *Agway, Inc. v. United States,* 48 AFTR 2d 81–5933, 81–2 USTC par. 9700 (Ct. Cl. 1981), for the proposition that the tax benefit rule does not apply to the redemption of notified equity. These cases, however, do not involve such an issue and have no application to the instant case.

[23] In respondent's opening statement at trial, respondent argues that qualified written notices of allocation fall somewhere between debt and equity. Petitioner objects to such a characterization. We note, however, that the "hybrid" nature of similar instruments has been previously addressed. See *Atwood Grain & Supply Co. v. Commissioner,* 60 T.C. 412 (1973); *Greenvine Corp. v. Commissioner,* 40 T.C. 926 (1963); *In re Voluntary Dissolution of Kitsap-Mason Dairymen's Association,* 497 P.2d 604 (Wash. Ct. App. 1972); see also Kerner, "Securities and Capital Structures of Farmer Cooperatives in California", 19 Hastings L.J. 309 (1968).

[24] Sec. 311(b) deals with distributions of appreciated property by a corporation.

[25] Although petitioner issues common stock, it began doing so only in 1985. In any event, petitioner's distributions in redemption of the notices cannot be said to have been made with respect to such common stock because petitioner made distributions to nonmembers who did not have and never had any common stock of petitioner. Consequently, petitioner's distributions cannot be said to have been issued with respect to stock unless the qualified written notices of allocation are deemed to be stock.

Neither the Internal Revenue Code nor the regulations define what constitutes "stock" for purposes of section 311.[26] Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 3.12, at 3–46 (5th ed. 1987); Kramer, Taxation of Securities, Commodities and Options, sec. 25.3, at 25–3 (1986). Additionally, we are not familiar with any case that defines stock for the purposes of section 311, and the parties have cited none. Stock has generally been defined as an equity interest in a corporation, either common or preferred, voting or nonvoting. Kramer, *supra* sec. 25.3, at 25–3; see *Mather & Co. v. Commissioner,* 171 F.2d 864 (3d Cir. 1949). The ownership of stock can include the following three rights: (1) The right to vote and thereby exercise control; (2) the right to participate in current earnings and accumulated surplus; and (3) the right to share in net assets on liquidation. The ownership of common stock usually involves all three rights, whereas the ownership of preferred stock generally involves the last two, but only to limited extents, unless otherwise provided. *Himmel v. Commissioner,* 338 F.2d 815, 817 (2d Cir. 1964), revg. 41 T.C. 62 (1963).

Black's Law Dictionary contains the following definition of "stock" under corporate law:

> The term is used in various senses. It may mean the capital or principal fund of a corporation or joint-stock company, formed by the contributions of subscribers or the sale of shares; the aggregate of a certain number of shares severally owned by the members or stockholders of the corporation or the proportional share of an individual stockholder; also the incorporeal property which is represented by the holding of a certificate of stock; and in a wider and more remote sense, the right of a shareholder to participate in the general management of the company and to share proportionally in its net profits or earnings or in the distribution of assets on dissolution. The term "stock" has also been held to embrace not only capital stock of a corporation but all corporate wealth and resources, subject to all corporate liabilities and obligations.
>
> "Stock" is distinguished from "bonds" and, ordinarily, from "debentures," in that it gives right of ownership in part of assets of corporation and right to interest in any surplus after payment of debt. "Stock" in a corporation is an equity, and it represents an ownership interest, and it is to be distin-

---

[26] In its reply brief, petitioner argues that sec. 1.1382–3(b), Income Tax Regs., broadly defines capital stock as including the instruments in question in the instant case. Petitioner's argument is without merit. Sec. 1.1382–3(b), Income Tax Regs., pertains to deductions for dividends paid on capital stock taken by exempt farmers cooperatives. Petitioner, however, is a nonexempt farmers cooperative. Moreover, the regulation, by its own terms, limits such definition to that section of the regulations.

guished from obligations such as notes or bonds which are not equities and represent no ownership interest.
[Black's Law Dictionary 1415 (6th ed. 1990); citations omitted.]

Petitioner apparently assumes that merely because qualified written notices of allocation are equity, such notices must be stock for the purposes of section 311(a). The question of whether an instrument representing an interest in a corporation is debt or equity is the subject of endless litigation. See, e.g., *Segel v. Commissioner,* 89 T.C. 816, 826 (1987).[27] We need not pursue that question, however, because, even if we were to hold that the qualified written notices of allocation are equity instruments, the question still remains whether, under the facts of the instant case, the notices are stock for the purposes of section 311(a).[28]

As the parties have stipulated that petitioner has never issued any preferred stock,[29] in order for the qualified written notices of allocation to be stock, they must be common stock. Section VI of the articles of incorporation authorizes petitioner to issue 5,500,000 shares of capital stock with a maximum of 500,000 shares as common stock of a par value of $1 each. In contrast, Article XVII of the bylaws separately discusses patrons' equities such as patronage dividend certificates, and qualified and nonqualified written notices of allocation. During 1985, petitioner began issuing one share of common stock to each member to evidence membership. Consequently, petitioner clearly knew how to designate a member's interest as a stock interest, but chose instead to issue the evidence of patronage dividends as qualified written notices of allocation.[30] Moreover, in order to be classified as common stock, the interest in question must include rights of ownership such as entitlement to surplus upon dissolution, whereas the holders of the qualified written notices of allocation were not members or owners of petitioner by reason of their holdings of such notices. All that a qualified written

---

[27] For a thorough discussion of the tax effects of an instrument's classification as debt versus equity, see Plumb, "The Federal Income Tax Significance of Corporate Debt: A Critical Analysis and a Proposal", 26 Tax L. Rev. 369 (1971).

[28] But see *Slappey Drive Indus. Park v. United States,* 561 F.2d 572, 580 n.12 (5th Cir. 1977) (stating without analysis that for purposes of sec. 351, the term "stock" would include certain debts to shareholders if the debts were characterized as equity).

[29] Sec. VI of petitioner's articles of incorporation authorizes petitioner to issue a maximum of 5 million shares of preferred stock with a par value of $1 each.

[30] As indicated *supra* p. 706, sec. 1388(b) provides that a written notice of allocation can be a share of capital stock.

notice of allocation entitles a holder to is money or property equal to the stated amount of the notice, or some lesser amount if it is redeemed early. A holder of qualified written notices of allocation has voting rights and property rights to participate in the surplus of petitioner only if the holder is also a member of petitioner and owns common stock.

Accordingly, as (1) the qualified written notices of allocation do not possess any of the salient features of common stock; (2) petitioner knew how to issue stock and chose not to do so; and (3) the parties stipulated that petitioner did not issue preferred stock, we hold that the qualified written notices of allocation are not stock for purposes of section 311 and that section 311(a) therefore does not apply. Consequently, we need not address whether section 311 overrides the tax benefit rule.

In conclusion, based on *Hillsboro Natl. Bank v. Commissioner* and *United States v. Bliss Dairy, Inc.,* 460 U.S. 370 (1983), we hold that the tax benefit rule requires that petitioner take into income the excess of the stated amounts of the qualified written notices of allocation over the discounted values paid on early redemption.[31]

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

[31] The parties have not made any arguments regarding the character of the income to be recognized by petitioner, and accordingly, we do not address such issue.