United States Court of Appeals,
Eleventh Circuit.

No. 96-8257.

GOLD KIST, INC., Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

April 21, 1997.

Appeal from a Decision of the United States Tax Court. (104 T.C. 696)

Before COX and BLACK, Circuit Judges, and FAY, Senior Circuit Judge.

PER CURIAM:

Gold Kist, Inc. ("Gold Kist") is a nonexempt farmers cooperative taxable under Subchapter T of the Internal Revenue Code, 26 U.S.C. §§ 1381-88 (1986). The Internal Revenue Service ("IRS") determined that Gold Kist's income taxes for three tax years were deficient because Gold Kist did not include in its gross income the difference between the stated value of qualified written notices of allocation and the discounted value paid to patrons who terminated their membership in the cooperative.

Gold Kist petitioned the United States Tax Court for a redetermination of the deficiencies. The Tax Court, 104 T.C. 696, (1995), held that, by virtue of the tax benefit rule, the difference should have been included in Gold Kist's gross income. Gold Kist appeals the decision of the Tax Court. We reverse.

## I. BACKGROUND

Gold Kist, a corporation organized under the Georgia Cooperative Marketing Act, operates as a cooperative. Gold Kist

sells farm supplies to farmers, buys crops and other farm products from them, and processes many of these products. Gold Kist does business both with farmers who are members of the cooperative, called "patrons," and with farmers who are not members.

Gold Kist annually determines its net earnings from business transacted with its patrons. These earnings are paid out to Gold Kist's patrons as patronage dividends on the basis of the quantity or value of business transacted with each patron. These patronage dividends in part take the form of written notices of allocation (also called "notified equity")[1]. These instruments entitle the patron to receive the stated amount of the written notice of allocation in cash at a future time when Gold Kist redeems the written notices. When these written notices are redeemed is at the discretion of Gold Kist's board of directors. Gold Kist's normal practice is to redeem the written notices that have been outstanding the longest. The timing varies, but twenty years has been the typical holding period. In 1986, for example, Gold Kist redeemed notices that had been allocated to patrons in 1966. Upon redemption in this manner, a patron receives in cash the full stated value of the notice. In addition, upon a patron's death, Gold Kist redeems written notices for full value.

Gold Kist also redeems written notices of allocation when a patron terminates his membership in the cooperative—called an "early redemption." Gold Kist, however, does not pay a patron who terminates his membership ("terminating patron") the full stated

_____

[1]Gold Kist's board of directors determines the form in which patronage dividends are paid.

value of his written notices.  Instead, Gold Kist discounts the notices to present value.  When discounting, Gold Kist utilizes the current interest rate on its 15-year Capital Certificates of Interest and the earlier of either an estimated redemption date[2] or the terminating patron's life expectancy (determined using standard mortality tables).

In accounting for early redemptions, Gold Kist decreases the patronage reserves account on its financial statement by the stated amounts of the notices and decreases its cash account by the amounts paid.  The differences between the stated amounts and the amounts paid are recorded on Gold Kist's financial statement as additions to its retained earnings account.

For federal income tax purposes, Gold Kist operates as a taxable cooperative under Subchapter T.  As such, Gold Kist must first determine its gross income without any adjustment for any allocation or distribution made to a patron out of its net earnings.  I.R.C. § 1382(a).  Next, Gold Kist must calculate its taxable income, which does not include amounts paid out as (1) patronage dividends to the extent paid in money, qualified written notices of allocation, or other property but not nonqualified written notices of allocation;  or (2) money or other property paid in redemption of a nonqualified written notice of allocation.  § 1382(b).  These amounts paid out are treated in the same manner as

_____

[2]Gold Kist bases the estimated redemption date on its current practice of redeeming its written notices of allocation. As such, the number of years between the date of early redemption and the estimated redemption date varies over time, depending on how long the notices that Gold Kist is currently redeeming have been outstanding.

deductions from gross income. § 1382(b). So, if a written notice of allocation is "qualified," a cooperative receives a deduction for the stated amount of the notice in the tax year in which the corresponding patronage occurred. In contrast, if a written notice is not qualified, a cooperative only receives a deduction for the amount of money paid in redemption of the notice in the year of redemption.

For a written notice of allocation to be "qualified," certain conditions must be met. A written notice of allocation is "qualified" if (1) the notice is redeemable by the patron in cash at its stated dollar amount at any time within 90 days of the date of distribution, and the patron is notified upon distribution of this right of redemption; or (2) the patron has consented [3] to include in his gross income the stated amount of the written notice of allocation. § 1388(c)(1). [4] Gold Kist utilized the second method to qualify the written notices of allocation at issue in this case.

During the tax years ended 1987 through 1989, Gold Kist redeemed qualified written notices of allocation in the manner described above.[5] For those three years, the differences between the stated value of the qualified written notices of allocation

---

[3] A patron may consent by one of three prescribed methods. *See* § 1388(c)(2).

[4] In either case, an additional requirement for a written notice of allocation to be "qualified" is that at least 20 percent of the patronage dividend be paid in cash or as a "qualified check." § 1388(c).

[5] The tax consequences of Gold Kist's redemption of nonqualified written notices of allocation was not at issue in the Tax Court and is not at issue here.

redeemed by terminating patrons and the amount Gold Kist actually paid to such patrons were as follows: in 1987, $1,141,424; in 1988, $1,355,551; and in 1989, $2,193,036. Since these written notices were qualified, Gold Kist claimed a deduction equal to the stated value of the notices. Each written notice had been qualified by virtue of the receiving patron's consent to include the stated value in his gross income in the year the notice was received.

The IRS determined that these differences between the stated amounts of the qualified written notices and the amounts actually paid to terminating patrons should have been included in Gold Kist's gross income and that, consequently, deficiencies were due for each year. Gold Kist petitioned the United States Tax Court for a redetermination of these deficiencies. The Tax Court held that, by virtue of the tax benefit rule, these differences should have been included in Gold Kist's gross income. In addition, the Tax Court rejected Gold Kist's argument that, notwithstanding the tax benefit rule, I.R.C. § 311(a)—which provides in general that a corporation recognizes no income upon redemption of its stock for cash—applies to its redemption of qualified written notices of allocation. Gold Kist appeals the Tax Court's decision.

## II. ISSUE ON APPEAL AND STANDARD OF REVIEW

We must decide whether the tax benefit rule requires a cooperative taxable under Subchapter T to include in gross income the difference between the stated value of written notices of allocation qualified under I.R.C. § 1388(c)(1)(B) and deductible under I.R.C. § 1382(b) and the discounted value paid to terminating

patrons.[6] The Tax Court's conclusion that the tax benefit rule requires inclusion of this difference in gross income is a conclusion of law and is, therefore, subject to *de novo* review. *See Atlanta Athletic Club v. C.I.R.,* 980 F.2d 1409, 1412 (11th Cir.1993).

## III. CONTENTIONS OF THE PARTIES

Gold Kist contends that the Tax Court misapplied the tax benefit rule. Gold Kist maintains that its deduction of qualified written notices of allocation is premised on its patrons' inclusion of that amount in gross income and that the later discounted redemptions are not fundamentally inconsistent with this premise. In fact, Gold Kist contends, there is no requirement that any amount ever be paid out to the patron to support its deduction.

The IRS contends that the tax benefit rule requires the inclusion in Gold Kist's gross income of the difference between the stated value of qualified written notices of allocation and the discounted value paid to terminating patrons. The IRS asserts that this difference ceased to be patronage dividends—and thus ceased to be deductible—when Gold Kist redeemed the qualified notices early and reclassified the difference as retained earnings on its financial statement.

## IV. DISCUSSION

The Supreme Court gave its most detailed analysis of the tax benefit rule in the consolidated cases of *Hillsboro Nat. Bank v. Commissioner and United States v. Bliss Dairy, Inc.,* 460 U.S. 370,

---

[6]Our disposition of this issue obviates the need to address Gold Kist's § 311 argument.

103 S.Ct. 1134, 75 L.Ed.2d 130 (1983). That analysis informs the application of the tax benefit rule in this case.

The tax benefit rule is a judicially created principle which serves to correct transactional inequities created by an annual accounting system. *Hillsboro,* 460 U.S. at 377, 103 S.Ct. at 1140. That is, "[o]ften an apparently completed transaction will reopen unexpectedly in a subsequent tax year, rendering the initial reporting improper." *Id.,* 460 U.S. at 377, 103 S.Ct. at 1140. In such a situation, the tax benefit rule corrects the improper initial reporting by requiring the taxpayer to report a tax liability to offset the previous, and now undeserved, tax benefit. The classic example of the need for the tax benefit rule is an apparently uncollectable debt—for which a deduction was taken in a previous tax year—that becomes collectable in a subsequent tax year. Ordinarily, return of capital is not taxable. But in this example, the tax benefit rule requires the taxpayer to report income in the amount of the previous deduction, so as to prevent him from benefiting from a deduction, the premise for which is now undermined.

As the Supreme Court pointed in out in *Hillsboro,* however, "[n]ot every unforeseen event will require the taxpayer to report income in the amount of his earlier deduction." *Id.* at 383, 103 S.Ct. at 1143. Instead, the general rule is that "the tax benefit rule will "cancel out' an earlier deduction only when a careful examination shows that the later event is indeed fundamentally inconsistent with the premise on which the deduction was initially based." *Id.,* 460 U.S. at 383, 103 S.Ct. at 1143. "That is, if

that event had occurred within the same tax year, it would have foreclosed the deduction." *Id.* at 383-84, 103 S.Ct. at 1143. Applied to the example of the bad debt deduction, the taxpayer would not be allowed a deduction had the seemingly bad debt been collected within the same taxable year.

We apply this general formulation of the tax benefit rule on a case-by-case basis. *Id.* at 385, 103 S.Ct. at 1144. And, in doing so, we "must consider the facts and circumstances of each case in the light of the purpose and function of the provisions granting the deductions." *Id.,* 460 U.S. at 385, 103 S.Ct. at 1144.

With this framework in mind, we turn to the present case. Subchapter T was enacted by Congress in 1962 in reaction to a series of court decisions that held that noncash allocation of patronage dividends by cooperatives were not taxable to the receiving patron, although they were deductible by the cooperative. *See* S.Rep. No. 1881, at—(1962) *reprinted in* 1962 U.S.C.C.A.N. 3304, 3414. Congress enacted Subchapter T to clarify and enforce its intention that earnings of cooperatives be taxable at a single level, either at the level of the cooperative or at the level of the patron. *Id.* at 3419. So, with regard to business it conducts with its patrons, a cooperative serves as a conduit, a flow-through, for federal income tax purposes.

To carry out this intention, Congress required that written notices of allocation be "qualified" in order for a cooperative to claim a deduction for patronage dividends paid in that form to its patrons. § 1382(b). In the present case, qualification was achieved by the consent of the patrons to include the stated amount

of the written notice in their gross income, pursuant to §
1388(c)(1)(B).  This approach insures single-level taxation.

Under Subchapter T, once consent is given (and assuming 20
percent has been paid in cash or as a qualified check), all
conditions for the deduction are met.  The statutory scheme created
by Congress does not require the cooperative to guarantee that
written notices of allocation qualified by consent pursuant to §
1388(c)(1)(B) will be redeemed at a certain time or at a certain
amount.  In this regard, written notices qualified by consent stand
in contrast to written notices qualified via the "90-day" method
established by § 1388(c)(1)(A) under which a cooperative must make
the entire stated dollar amount available to the patron for
redemption.

Congress views the deduction transaction as complete after the
patron has given consent—upon consent, "the patron has in effect
acknowledged constructive receipt of the entire amount of the
patronage dividend and has voluntarily reinvested the amount of the
allocation in the cooperative."  S.Rep. No. 1881, at—(1962)
*reprinted in* 1962 U.S.C.C.A.N. 3304, 3418.  The Tax Court
interpreted this legislative statement as "merely serv[ing] as
justification for taxing the patrons prior to receipt and does not
necessarily dictate that the redemption of the qualified written
notices of allocation is no longer connected to the original
allocation of patronage dividends for which a deduction was taken."
104 T.C. at 715, 1995 WL 376486.  While this statement serves as
such a justification, it also describes the mechanism Congress
chose to achieve single-level taxation:  once taxation is achieved

at the patron level, the character of the transaction changes and later events are judged in light of that changed character. Moreover, we disagree with the Tax Court's conclusion that Gold Kist's payments ceased to be deductible as patronage dividends when Gold Kist redeemed the qualified written notices for less than their stated amounts and reclassified the difference on its financial statement. Following consent, Congress instructs us to treat the patrons' allocation as a reinvestment—it is no longer treated as a patronage dividend. The patronage dividends here were paid in the form of qualified written notices of allocation; the cash with which Gold Kist redeemed those notices were not the patronage dividends as described in § 1388(a). The requirement that these notices be paid on a patronage basis as defined by § 1388(a) is properly analyzed at the time the deduction is taken.

That Congress did not intend for later events to affect a cooperative's deduction for written notices of allocation once qualified by consent is reinforced by Subchapter T's treatment of nonqualified written notices of allocation. Patronage dividends paid as nonqualified written notices of allocation are not deductible; a cooperative only receives a deduction for money or property paid in redemption of nonqualified written notices of allocation. § 1382(b)(2). This distinction is additional evidence that qualification by consent is the premise that supports a cooperative's deduction of the full stated value of qualified written notices of allocation.

So, as the structure and legislative history of Subchapter T make clear, Gold Kist's deduction is premised on its patrons'

consent to include the stated amount of the written notice in gross income.  We cannot say that Gold Kist's redemption of qualified written notices of allocation for less than their stated amounts is fundamentally inconsistent with this premise.  A tax year 1987 deduction, for example, is not initially premised on a commitment by Gold Kist to pay in real dollars the stated value of the qualified written notice of allocation;  payment twenty years later of that amount of money is simply not the equivalent of the 1987 stated value.

Moreover, if the early redemption had occurred within the same taxable year[7], Gold Kist's deduction would not be foreclosed.  Once the written notice of allocation is qualified, the prerequisites for the deduction are satisfied and any later events—whether occurring in the same tax year as the deduction or in a subsequent tax year—are properly viewed as separate transactions.

Our conclusion is consistent with the Supreme Court's application of the tax benefit rule to the two situations presented in *Hillsboro* and *Bliss*.  In *Bliss,* the taxpayer corporation took a deduction for cattle feed as an ordinary and necessary business expense under I.R.C. § 162(a).  During the following tax year, Bliss liquidated and distributed its assets, including the cattle feed on hand, to its shareholders.  The Supreme Court concluded that the tax benefit rule applied because the § 162(a) deduction is predicated on the consumption of the asset in a trade or business

---

[7]Although this timing might be impossible in the present case, the Tax Court properly pointed out that the Supreme Court in *Hillsboro* directs us to perform a hypothetical analysis:  what would have happened had the qualified written notices of allocation been issued and redeemed in the same tax year.

and distribution to shareholders is equivalent to personal consumption. 460 U.S. at 395-96, 103 S.Ct. 1149-50. Bliss, therefore, was required to report income equal to the amount of the deduction attributable to the grain on hand.

In *Hillsboro,* the Supreme Court concluded that the tax benefit rule did not apply. There, the section at issue was § 164(e), which grants a corporation a deduction for taxes imposed on its shareholders but paid by the corporation. Hillsboro, an Illinois bank, ordinarily paid the property tax imposed on its shareholders' shares and, in turn, received an equivalent deduction by virtue of § 164(e). In 1970, Illinois prohibited ad valorem taxation of personal property of individuals. While this prohibition was being challenged in court, the bank paid the shareholders' taxes into a state escrow account and continued to take a deduction for this amount. After Illinois' prohibition was upheld, the taxes were refunded to the individual shareholders. The IRS contended that this amounted to a deduction for the payment of a dividend, which is generally not permitted. The Supreme Court disagreed. The Court pointed out that the effect of § 164(e), and other Code sections as well, is to permit a deductible dividend in certain situations. After looking at the legislative history of § 164(e), the Court concluded that Congress intended to provide relief to corporations paying taxes for their shareholders and that Congress' focus was on the corporation's act of payment, not on the later disposition of the funds.

In both cases, the Supreme Court looked to the structure of the sections at issue and their legislative histories to discern

the premise of the deductions.  In *Bliss,* the premise was business use;  in *Hillsboro,* the premise was the payment of taxes on behalf of the shareholder.  We have done the same here.        *Hillsboro* particularly informs our decision.  The *Hillsboro* Court looked to legislative statements—statements arguably much more ambiguous than the statements available to us here—to conclude that later events did not affect the bank's deduction.  Gold Kist's deductions were premised on its patrons' consent to include the stated amount of the written notices of allocation in gross income.  Because the later redemption of the notices for less than the stated amount is not fundamentally inconsistent with this premise, the tax benefit rule has no application here.  Accordingly, the decision of the Tax Court is REVERSED.

REVERSED.